ORIGINAL

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

DIAMOND POWER                  )
INTERNATIONAL, INC.            )
                               )
              Plaintiff,       )
        v.                     )        CIVIL ACTION
                               )
WAYNE DAVIDSON,                )        FILE NO. 1:04-CV-0091-RWS
                               )
              Defendant.       )
_____)

## PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

COMES NOW Plaintiff Diamond Power International, Inc.

("Diamond Power") and, pursuant to Fed. R. Civ. P. 65 and other applicable

law, and moves for entry of a temporary restraining order and preliminary

injunction against Defendant Wayne Davidson ("Davidson"). Diamond

Power seeks relief in the form of the proposed Order attached to Diamond

Power's memorandum in support hereof, filed contemporaneously herewith.

In support of its motion, Diamond Power relies on the Declarations of Jeff

Koksal, Lou Stang, Greg Fordham, and upon the argument and citation of

authority set forth in Diamond Power's memorandum of law.

Respectfully submitted this ____ day of January, 2004.

ALSTON & BIRD LLP

By: _____
Warren R. Hall, Jr.
Georgia Bar No. 319405
Allison J. Viscardi
Georgia Bar No. 728059
ALSTON & BIRD LLP
1201 West Peachtree Street
Atlanta, Georgia 30309-3424
(404) 881-7000
(404) 881-7777

ATTORNEYS FOR DIAMOND
POWER INTERNATIONAL, INC.

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| DIAMOND POWER INTERNATIONAL, INC. | ) ) ) | |
| Plaintiff, | ) | |
| v. | ) | CIVIL ACTION |
| | ) | |
| WAYNE DAVIDSON, | ) | FILE NO. 1:04-CV-0091-RWS |
| | ) | |
| Defendant. | ) ) | |

## CERTIFICATE OF SERVICE

I hereby certify that I have this date served the foregoing Plaintiff's

Motion for Temporary Restraining Order and Preliminary Injunction on all

parties to this action by depositing a copy of the same in U.S. mail, regular

delivery addressed as follows:

Wayne Davidson
1834 Webb Gin House
Snellville, Georgia 30078

This the 14th day of January, 2004.

Allison J. Viscardi
Georgia Bar No. 728059

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

DIAMOND POWER                    )
INTERNATIONAL, INC.              )
                                 )
            Plaintiff,           )
       v.                        )       CIVIL ACTION
                                 )
WAYNE DAVIDSON,                  )       FILE NO. 1:04-CV-0091-RWS
                                 )
            Defendant.           )
_____  )

## PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

### I.   INTRODUCTION

Pursuant to Fed. R. Civ. P. 65, and for the reasons set forth herein, Plaintiff Diamond

Power International, Inc. ("Diamond Power") respectfully requests that the Court enter a

temporary restraining order and interlocutory injunction against its former employee

Wayne Davidson ("Davidson").  In support of its Motion for Temporary Restraining

Order and Preliminary Injunction, Diamond Power shows that Davidson wrongfully

obtained and retained property of Diamond Power and misappropriated trade secrets of

Diamond Power.



Diamond Power seeks injunctive relief which is narrowly tailored to meet the specific threats uniquely posed by Davidson's actions.  Diamond Power seeks an order to preserve the status quo providing relief as outlined below:

1.  directing Davidson, within 24 hours of receipt of this Court's order, to return to Diamond Power any and all documents or information, in whatever form including, but not limited, to computer disks or hard drives, which contain information pertaining to Diamond Power's customers, products, prices, production schedules, operations, financial records, or related information, including any and all copies or derivatives thereof.

2.  enjoining Davidson from using or disclosing to anyone not employed by Diamond Power any information contained in documents or computer files retained by Davidson from his employment with Diamond Power which fairly meet the following descriptions:

| File name | Description (date of last access on zip drive) |
|---|---|
| Dpii.balance.txt<br><br>DPII.incomeI.txt | Diamond Power 2003 year-to-date balance sheet and income statement (10/14/03). |
| Powertrain.xls | List of all sales of new Powertrain Carriages identifying customers, customer locations, quantity, description of order, and sales price (10/13/03). |
| Ikschd.xls | Diamond Power's IK sootblower production schedule identifying every sootblower produced since March 1998 by customer, date |

| | |
|---|---|
| | and cost; also includes prospective production schedules for all placed orders (10/9/03). |
| Cost Markup Multipliers.doc | List of Diamond Power multiplier formulae for setting prices of non-standard priced equipment (10/8/03). |
| DPSC [customer A].xls | Diamond Power's parts price list for customer A (10/8/03). |
| [customer B].xls | Diamond Power's parts price list for customer B facility (10/8/03). |
| [customer C] 8.03.xls | Diamond Power's parts price list for customer C (10/8/03). |

3. enjoining Davidson from altering, erasing, deleting, destroying any computer, computer drive, computer disk, or other information containing medium currently in his possession, custody or control, or in any way spoliating evidence pertaining to his appropriation of documents, information, or property from Diamond Power; and

4. directing Davidson, within 24 hours of Davidson's receipt of the Court's Order, or notice of the existence of the Order, to produce to counsel for Diamond Power any computer or other information storing medium, including disk drives, hard drives, and computer disks, specifically including any external zip drives, owned by him or existing within his possession, custody, or control so that such items may be imaged and examined by a computer forensic examiner

to preserve evidence that may be contained thereon.  The forensic examination shall be carried out by an independent examiner who is not an employee of Diamond Power.

## II.   FACTUAL BACKGROUND

A.   Davidson's Employment with Diamond Power.

Diamond Power is in the business of providing boiler cleaning systems and products primarily to the pulp and paper, chemical, and electric utility industries. (Declaration of C.G. Koksal ¶ 3).[1]  The cleaning systems, called "sootblowers," and their related systems are designed to keep industrial boilers operating at peak efficiency. (Id.).

Davidson held the position of Manager of U.S. Service Center Operations for Diamond Power from approximately June 2002 until his separation of employment effective October 31, 2003.  (Koksal Decl., ¶ 4).  In this position, Davidson was responsible for supervising Diamond Power's three service centers located in metropolitan Atlanta, Chicago, and Seattle.  (Id.).

Diamond Power's regional service centers provide maintenance and rebuilding services for sootblowers and related equipment. (Koksal Decl., ¶ 5).  As Manager of U.S. Service Center Operations, Davidson was a point of centralized control over all

---

[1]     The Declaration of C.G. Koksal is attached hereto as Exhibit A and will be referred to hereinafter as "Koksal Decl. at ¶."

three service center facilities in the United States and reported to Diamond Power's General Manager of Sales and Service. (Id.). In this capacity, Davidson was responsible for operational performance and expense control for each of the service centers, managing inventory levels at the service centers, and assisting in the sales process to provide customers of Diamond Power with analysis and recommendations, evaluating alternatives to new equipment purchases, including rebuilding and maintenance programs offered by Diamond Power through its service center. (Id.).

As a condition of his employment with Diamond Power, Davidson was required to execute a Proprietary Information and Conflict of Interest Agreement ("Proprietary Information Agreement"). (Koksal Decl., ¶ 19, Ex. C). In the Proprietary Information Agreement, Davidson pledged that he would

> not disclose to anyone outside of B&W, or use in other than B&W's business, any technical or non-technical information or material which gives B&W an advantage over others who do not know it . . . relating to the business of B&W or its subsidiaries, either during or after my B&W employment, except with B&W's written permission. . . . I further agree that upon termination of my employment with B&W, all records or proprietary information of B&W including copies thereof in my possession, whether prepared by me or others will be left with B&W.[2]

(Id.).

---

[2]    The Babcock & Wilcox Company ("B&W") is Diamond Power's parent. (Koksal Decl., ¶ 14). In Davidson's Proprietary Information Agreement, "B&W" is defined to include Diamond Power as a subsidiary of the Babcock & Wilcox Co. (Id., ¶ 20).

B.    Davidson's Separation from Employment with Diamond Power.

On or about September 30, 2003, Davidson notified his direct supervisor, Jeff Koksal, of his intent to "retire" from his employment with Diamond Power effective October 31, 2003. (Koksal Decl., ¶ 6, Exh. A). A few weeks later, Davidson notified Mr. Koksal that he would be taking vacation, to commence on October 16, 2003, and continue through October 27, 2003. (Id., ¶ 7). On October 28, 2003, upon the return from his vacation, Diamond Power conducted Davidson's exit interview, which effectively ended his employment for Diamond Power. (Id.). Upon the separation from his employment, Davidson returned his company-owned laptop computer to Diamond Power. (Declaration of Lou Stang, ¶ 11).[3]

C.    Davidson's Unlawful Activities.

As is Diamond Power's normal practice with its departing employees, Diamond Power's IT Department examined the status of Davidson's company-owned laptop computer ("the Davidson laptop") upon its return. (Stang Decl., ¶ 11). Upon examination, the IT Department discovered that significant portions of the Davidson laptop's email system and all word and spreadsheet documents on the Davidson laptop had been deleted, erased, or overwritten prior to the return of it to Diamond Power. (Id.).

---

[3]    The Declaration of Lou Stang is attached hereto as Exhibit B and will be referred to hereinafter as "Stang Decl., ¶."

Diamond Power commissioned a forensic computer examination of the Davidson laptop. (Stang Decl., ¶ 12). The forensic examination revealed that Davidson accessed data, records, and documents stored on the Diamond Power computer network, Diamond Power's Oracle database, or the Davidson laptop and copied or somehow transferred files to an external "zip" drive attached to, but external from, the Davidson laptop.[4] (Id.). Because Diamond Power did not provide an external zip drive to Davidson for his use as an employee of Diamond Power, the zip drive must have been acquired by Davidson from some source other than Diamond Power. (Id.). Davidson did not turn in an external zip drive to Diamond Power as part of his computer equipment when he turned in his company laptop. (Id.).

By copying files and documents to his external zip drive, Davidson would retain access to the information after returning the Davidson laptop to Diamond Power and after Davidson could no longer access Diamond Power's computer network or Oracle database system. (Stang Decl., ¶ 13). In other words, by copying information to his zip drive, Davidson could retain access to and use of the information after his separation from employment. (Id.).

Specifically, the forensic examination of the Davidson laptop revealed that during October 2003, in the weeks immediately prior to his "retirement," Davidson

---

[4]     An external zip drive is a means of storing data or information outside of the computer hard drive itself. (Stang Decl., ¶ 12).

misappropriated the documents and information from Diamond Power as described below. (Stang Decl., ¶ 13).

        1.     PowerTrain Spreadsheet.

This highly sensitive spreadsheet contains confidential information about all sales of a new product offering, the PowerTrain carriage system, that was introduced by Diamond Power into the marketplace only in late 2002. (Koksal Decl., ¶ 9). Specifically, the spreadsheet identifies each customer who had purchased a PowerTrain carriage upgrade from Diamond Power through 2003, and specifically includes the following information: customer name, customer location by city and zip code, description of the products and services to be provided, identification of the quantity of the products and services purchased, the unit selling price, the current status of the purchase, and the date of shipment. (Id., ¶10). The sales reflected on the spreadsheet reflect only the initial purchases by these Diamond Power customers. (Id.). Typically, these Diamond Power customers operate from 30 to 80 or more sootblowers which would eventually be rebuilt with the PowerTrain product in the coming months and years. (Id.). Thus, the initial sales reflected in the PowerTrain spreadsheet represent only the "tip of the iceberg" of the sales Diamond Power anticipates having in the coming years with just the customers identified within it. (Id.).

        2.     Financial Records.

The financial reports include Diamond Power's 2003 balance sheets and its

income statement through September 2003.  (Koksal Decl, ¶ 12).  The Diamond Power

balance sheets list and specifically identify current assets, investments and advances,

total fixed assets, net fixed assets, current liabilities, tax reserves, inter-office accounts

payable, total other liabilities, total long term notes payable, total redeemable preferred

stocks, common stock and other stock holders' equity including current capital, retained

earnings, and current profit statistics. (Id.).  The Diamond Power income statement

report identifies monthly and year to date financial data through September 2003 and

reveals Diamond Power's gross income, total income, gross profit, operating expenses

and net income.  (Id.).

           3.      IK Production Schedule.

       The IK Production schedule documents lists Diamond Power's production

schedule for its primary line of sootblowers:  the IK.  (Koksal Decl., ¶15).  The

production schedule document reflects data dating back to March 1998; it also contains

prospective schedules for all booked orders for IK sootblowers received through

September 2003.  (Id.).

       The IK Production Schedule document reveals the identity of the customers for

which the sootblowers are being constructed, the specific types of sootblowers ordered,

the quantity ordered, the dates of the orders, the ship date, and the prices.  (Id.).

           4.      Cost Markup Multipliers and Customer Price Lists.

       The cost markup multiplier document contains Diamond Power's specific

formulae for pricing several categories of replacement and upgrade parts. (Koksal Decl.,

¶ 16).  In short, the document reveals the multiplication factors which Diamond Power

applies to the cost of manufacturing a part, component, or assembly to arrive at its sales

price.  (Id.).  These formulae are used to develop "list" pricing for all replacement and

upgrade parts.  (Id.).

D.    Diamond Power's extensive efforts to maintain the secrets of its
      Confidential and Proprietary Information.

Diamond Power does not disclose any of the information, in the detail contained

in the above-referenced documents, to anyone outside of Diamond Power or its parent

corporation.  (Koksal Decl., ¶¶ 11, 14-16).  Diamond Power's internal computer network

(the "network") is made available to most, but not all, Diamond Power employees.

(Stang Decl., ¶ 5).  Access is expressly limited to those employees who are provided a

login and password which permits entry into the network.  (Id.).  Such employees are

considered authorized "users" of the network.  (Id.).  Each network user is assigned a

profile which permits the particular user to access certain applications and drives on the

network.  (Id.).  All network users are not given access to all areas of the network.  (Id.).

Additionally, information contained within the network is subject to an extra

layer of password protection.  (Stang Decl., ¶ 6).  For example, the database system

within the network called Oracle is available to only a limited group of network users.

(Id.).  Access to Oracle is protected by a user name and password assigned by the

information technology ("IT") department. (Id.). These user names and passwords are provided only to Diamond Power network users with a need to access the Oracle system. (Id.). Moreover, access to the Oracle system is further limited in that employees are permitted to access certain portions of the Oracle system to which it has been determined that they need access.[5] (Id.).

In addition to the login and password protections for the protection of access to the network and a second layer of password and user name protection for access to the Oracle database system, the entire Diamond Power computer network is firewall protected to prevent unauthorized access by unauthorized persons. (Stang Decl., ¶ 8). As an additional level of security, physical access to Diamond Power's operational headquarters in Lancaster, Ohio, where its computer systems are housed, is limited by regulations requiring all employees to wear and display identification badges while in the office. (Id.). Visitors must identify themselves, sign in, and be accompanied while in the offices. (Id.). After hours, access to Diamond Power's Lancaster office is controlled by security guards who permit access only upon showing a valid company identification badge. (Id)

---

[5]     Out of approximately 500 total Diamond Power employees, less than ¾ are network users. Thirty-four percent (34%) of Diamond Power employees have no access at all to the Oracle system. Outside of the accounting department and three (3) employees in the IT department, only eighteen (18) employees of Diamond Power had access to the financial records in Oracle misappropriated by Davidson as recounted above. (Stang Decl., ¶ 7).

E.   Irreparable Harm to Diamond Power

Despite announcing his intention to "retire", Davidson instead is currently

employed with Clyde Bergemann, Inc.  (Koksal Decl., ¶ 21).  Clyde Bergemann is a

major competitor of Diamond Power; the two companies are involved in virtually the

same lines of business and regularly compete for business opportunities in the

sootblower business.  (Id.).  Clyde Bergemann operates a facility in the Atlanta, Georgia

metropolitan area.  (Id.).

Diamond Power will be severely and irreparably harmed if Davidson were to

disclose the information in the documents discussed above to anyone outside of

Diamond Power, including his current employer, or if he were to use the information

contained in said documents on behalf of Clyde Bergemann.  (Koksal Decl., ¶¶ 17, 22).

III.   ARGUMENT AND CITATION OF AUTHORITY

A.   Standard for Issuance of Injunctive Relief

Temporary injunctive relief to preserve the status quo is appropriate where the

ordinary standards for the issuance of temporary injunctive relief are satisfied.  United

States v. State of Alabama, 791 F.2d 1450, 1459 (11th Cir. 1986) ("The purpose of a

preliminary injunction is to prevent irreparable injury so as to preserve the court's ability

to render a meaningful decision on the merits").  A temporary restraining order ("TRO")

may be entered in advance of a full hearing whenever a plaintiff will suffer immediate

and irreparable injury, loss, or damage before it is possible for the defendant to be heard in opposition to the Plaintiff's motion for preliminary injunction. Fed. R. Civ. P. 65; Caplan v. Fellheimer Eichen Braverman & Kaskey, 68 F.3d 828, 839 (3d Cir. 1995). As shown below, the facts at hand establish that Diamond Power will suffer immediate and irreparable harm if Davidson is not restrained immediately pending a hearing on its motion for preliminary injunction relief.

The review of a district court's decision to grant or deny a temporary restraining order is very narrow in scope, highly deferential, and will only be reversed upon a finding of a clear abuse of discretion. Four Seasons Hotels & Resorts, B.V. v. Consorcio Barr, S.A., 320 F.3d 1205, 1209 (11th Cir. 2003); Siegel v. Lepore, 234 F.3d 1163, 1175 (11th Cir. 2000). To support a TRO or preliminary injunction, a district court need not find that the evidence positively guarantees a final verdict in a plaintiff's favor. Levi Strauss & Co. v. Sunrise Int'l Trading, Inc., 51 F.3d 982, 985 (11th Cir. 1985). A district court may issue a TRO or preliminary injunction when the moving party shows that:

1. There is a substantial threat that the movant will suffer an irreparable injury if injunctive relief is not granted;

2. The threatened injury to the movant outweighs the threatened harm the injunction may inflict on the respondent;

- 13 -

3.      There is a strong probability of success on the merits of the

case; and

4.      The granting of the injunction will not disserve the public

interest.

Four Seasons Hotels, 320 F.3d at 1210; Siegel, 234 F.3d at 1176; Tefel v. Reno, 180

F.3d 1286, 1295 (11th Cir. 1999). A showing of irreparable injury is the "*sine qua non*"

of a request for injunctive relief. Siegel, 234 F.3d at 1176.

Diamond Power's request for injunctive relief should be granted because

Davidson has violated the Georgia Trade Secret Act and the terms of his Proprietary

Information Agreement by retaining Diamond Power's confidential and trade secret

information. The disclosure of such information to any one outside of Diamond Power,

including without limitation Davidson's current employer, Clyde Bergemann, will cause

Diamond Power to suffer immediate and irreparable harm.

B.      There is a substantial likelihood that Diamond Power will prevail on the merits of its claims.

While proof of a substantial likelihood of success on the merits is the first

prerequisite to preliminary injunctive relief, it is not necessary for a plaintiff to

demonstrate a no-lose situation in order to obtain such relief. "[A] court's conclusions

as to the merits of the issues presented on preliminary injunction are to be understood as

statements of *probable* outcomes." B.P.G. Autoland Jeep-Eagle, Inc. v. Chrysler Credit

- 14 -

Corp., 785 F. Supp. 222, 227 (D. Mass. 1991) (quoting Narrangansett Indian Tribe v.

Guilbert, 934 F.2d 4, 6 (1st Cir. 1991)); Roadway Express, Inc. v. Donovan, 603 F.

Supp. 249, 251 (N.D. Ga. 1985).

Diamond Power easily satisfies this element of the test for injunctive relief

because, as demonstrated below, Georgia law provides statutory protection of trade

secret information like that placed in peril under the facts of this case. Additionally,

Georgia law prohibits the conversion of confidential and proprietary information, which

conduct constitutes an express breach of contractual obligations.

1.   There is a substantial likelihood that Diamond Power will prevail on
      the merits of its claim for violation of the Georgia Trade Secrets Act.

The information that Davidson copied to his zip drive constitutes trade secret

information protected from disclosure to third parties by the Georgia Trade Secrets Act

("GTSA"). The GTSA defines the term "trade secret" as any information that (1) has

actual or potential economic value to its possessor because others who can obtain

economic value by using or disclosing it generally do not know it and cannot readily

ascertain it by proper means; and (2) is the subject of reasonable efforts under the

circumstances to maintain its secrecy. O.C.G.A. § 10-1-761(4). The GTSA specifically

provides for injunctive relief to protect not only actual, but also "threatened

misappropriation" of a trade secret. O.C.G.A. § 10-1-762(a).

The proprietary information at issue in this case satisfies both prongs of the trade secret definition. First, the information misappropriated by Davidson contains detailed information pertaining to Diamond Power's customers. The PowerTrain document identifies by name and location all customers who had purchased the new upgrade through September 2003, descriptions of the purchase orders, and lists the quantity and price of the order. (Koksal Decl., ¶ 10.) Likewise, the IK Production Schedule document identifies customers who have ordered sootblowers, the specific type ordered, the quantity, the ship date, and the price. (Id., ¶ 15). Such customer identifying information together with specific and detailed information about the customers' purchases and equipment renders these documents quintessential trade secrets. Georgia courts have repeatedly held that tangible lists and computer files containing the identities of, and specific information about, particular actual customers, supplies, or vendors constitutes protectable trade secrets under the GTSA because the information has actual economic value and is not readily known to competitors. See DeGiorgio v. Megabyte Int'l, Inc., 266 Ga. 539, 540 (1996); Avnet v. Wyle Labs. Inc., 263 Ga. 615, 616-17 (1993).

The documents taken by Davidson also include other types of trade secret information related to Diamond Power's products, prices, and financial records which constitute trade secret information under Georgia law. See O.C.G.A. § 10-1-791(4) (including "product plans" and "financial data" and "financial plans" within the

- 16 -

definition of trade secret under GTSA); Camp Creek Hospitality Inns, Inc. v. Sheraton Franchise Corp., 139 F.3d 1396, 1410 (11th Cir. 1998) ("Georgia defines trade secrets broadly to include non-technical and financial data."). As set forth in the Declaration of Jeff Koksal, Diamond Power's price formulas and price lists are not known to competitors and could be used by them to unfairly compete by consistently underbidding Diamond Power. (Koksal Decl., ¶ 16). Further, price and markup information could be used to ascertain Diamond Power's cost basis for manufactured parts which, again, would allow a competitor to know in advance how Diamond Power would and could price a particular piece of equipment. (Id.) The financial records (income statements and balance sheets) misappropriated by Davidson give a rare glimpse inside Diamond Power's financial walls revealing information unavailable to all but the highest level managers. Information such as gross profit, gross income, and net income would provide a competitor valuable insights into Diamond Power's financial condition, production costs, and financial strategy. (Koksal Decl., ¶¶ 12, 14.)

Second, Diamond Power has made reasonable efforts to keep this proprietary information secret. As discussed in detail above, Diamond Power password protects and restricts access to both its internal computer network and Oracle database system. (Stang Decl., ¶¶ 5-6). Significant numbers of employees are not provided access to the network whatsoever and even a greater number have no access to the Oracle system. (Id., ¶ 7). Diamond Power utilizes additional security measures to protect unauthorized

- 17 -

access to its entire computer network and restricts physical access to its offices where computer systems are housed. (Id., ¶ 8). Moreover, Diamond Power requires all employees to execute non-disclosure agreements that prohibit employees from disclosing its proprietary information to anyone outside of Diamond Power. (Koksal Decl., ¶ 19.) Thus, Diamond Power can establish that all of the information copied to Davidson's zip drive has at all times been subject to reasonable efforts to maintain its secrecy. See Avnet, 263 Ga. at 617 (holding that requiring employees to sign non-disclosure agreements constitutes a reasonable effort to maintain secrecy of information); Tronitec v. Shealy, 249 Ga. App. 442, 448 (1991) (finding that evidence that employer controlled access to its facility where trade secret information was located would support jury finding that employer took reasonable steps to protect secrecy of information).

In order to establish a claim for misappropriation of trade secrets in violation of the GTSA, Diamond Power must establish not only the existence of trade secrets, but also that Davidson misappropriated the trade secrets. Camp Creek Hospitality Inns, Inc., 139 F.3d at 1410; TDS Healthcare Sys. Corp. v. Humana Hosp. Illinois, Inc., 880 F. Supp. 1572, 1582 (N.D. Ga. 1995). Here, computer records undeniably show that

Davidson "misappropriated"[6] Diamond Power's trade secret information by copying

such information to his own personal zip drive and retaining it after his separation from

employment.  Thus, Diamond Power has demonstrated a substantial likelihood that it

will prevail on its claim for misappropriation of trade secrets in violation of the GTSA.

    2.    <u>There is substantial likelihood that Diamond Power will prevail on<br>its claim for breach of the Proprietary Information Agreement.</u>

To prevail on its claim for breach of contract under Georgia law, Diamond Power

must establish (1) the existence of a valid contract; (2) a material breach of its terms;

and (3) damages arising therefrom.  <u>TDS Healthcare Sys. Corp.</u>, 880 F. Supp. at 1582.

Here, the Proprietary Information Agreement executed by Davidson plainly constitutes

a valid contract.  <u>Equifax Serv., Inc. v. Examination Mgmt. Serv., Inc.</u>, 216 Ga. App.

35, 37-38 (1994) (holding that return of property agreement between employee and

employer was valid and enforceable).  As discussed in detail above, Diamond Power

can establish that Davidson's failure to return, upon the separation of his employment,

the data, records, and information that Davidson copied to his zip drive, constitutes a

breach of the express terms of the Proprietary Information Agreement.  Accordingly,

Diamond Power has met its burden of demonstrating a substantial likelihood of success

on the merits of its claim for breach of contract.

---

[6]    The GTSA defines "misappropriation" to include both the disclosure or use of a trade secret by one without consent, and the acquisition by one of a trade secret known to be unlawfully acquired. O.C.G.A. § 10-1-764.  Accordingly, Davidson's taking, disclosure, or use or the confidential information is actionable under the GTSA. <u>Id</u>.

3.   There is substantial likelihood that Diamond Power will prevail on its tort claim for conversion.

Wrongful conversion or misappropriation of property belonging to another is an actionable tort, regardless of whether the property rises to the level of a trade secret. See Tronitec, 249 Ga. App. at 448 (trial court erred in granting plaintiff's summary judgment with respect to defendant's counterclaim for conversion of a personal computer, which is personal property and not a trade secret). To establish a claim for conversion, a plaintiff must show that (1) it has title to the property; (2) it has the right to possess it; (3) that the defendant has possession of the property; and (4) the defendant has refused to turn over the property of value. See City of College Park v. Sheraton Savannah Corp., 235 Ga. App. 561 (1998).

Here, Davidson has taken property, including confidential information and trade secrets, which is the sole and exclusive property of Diamond Power and has failed to return the same upon his separation of employment, or at any time thereafter. Davidson pledged, in his Proprietary Information Agreement, that he would return all records of proprietary information to Diamond Power, including all copies in his possession, upon separation of his employment. However, Davidson's conduct as discussed above demonstrates that Davidson failed to return Diamond Power's information to it. Based on this evidence, Diamond power has met its burden of demonstrating a substantial likelihood of success on the merits of its conversion claim.

C.    Diamond Power Will Suffer Irreparable Injury If Injunctive Relief Is Not
      Granted.

It is widely recognized that loss of confidential and proprietary information is not

measurable in money damages and is thus considered "irreparable harm." O.C.G.A.

§ 10-1-762(a) (expressly allowing for injunctive relief for actual or threatened

misappropriation of trade secret information); Specialty Chemicals & Serv., Inc. v.

Chandler, No. 1:87CV-2338MHS, 1988 WL 618583, at *5 (N.D. Ga. Sept. 29, 1988)

(finding that the mere "[t]hreat of disclosure, destruction or dilution of [a] plaintiff's

trade secrets constitutes irreparable injury justifying injunctive relief."); Unisource

Worldwide, Inc. v. S. Cent. Alabama Supply, LLC, 199 F. Supp. 2d 1194, 1212 (M.D.

Ala. 2001) (finding that harm to employer from former employee's alleged disclosure of

trade secrets was irreparable); see also Leo Publications, Inc. v. Reid, 265 Ga. 561, 562

(1995) (affirming trial court's order directing defendant to return former employer's

customer list). The threat of irreparable injury which Diamond Power faces as a

consequence of Davidson's conduct (misappropriation of trade secrets, breach of

Proprietary Information Agreement, and conversion) is palpable. In light of the

evidence tending to show that Davidson possesses Diamond Power's trade secrets, the

threat of disclosure or use of this information is significant. If Diamond Power's

confidential and trade secret information is disclosed to anyone outside of Diamond

Power, especially to its primary competitor Clyde Bergemann, the injury suffered would

be permanent.

For example, if Diamond Power's cost multiplier formulas were to be disclosed to a competitor, the competitor would have insights into Diamond Power's pricing structure. If a competitor reviewed Diamond Power's PowerTrain document, it would know which customers were purchasing upgrades, the types of equipment being purchased, and the price; with this information the competitor could unfairly compete against Diamond Power to divert forthcoming business from customers who are in need of upgrade services. Likewise with respect to the IK schedule documents, a competitor could identify the customers making purchases, the types of equipment and services being purchased, and even the time frames of the orders and shipment dates. Because the injury threatened to Diamond Power is clear, present, and irreparable, injunctive relief is uniquely appropriate.

D.      The Balance of Hardships Supports Entry of Injunctive Relief.

Davidson will suffer no cognizable injury if the injunctive relief Diamond Power seeks is issued. The only effect such injunctive relief will have on Davidson is to force him to abide by his contractual obligations and return to Diamond Power what rightfully belongs to it. In contrast, Diamond Power has expended significant resources in the design and development of its trade secrets and has gone to great lengths to ensure that they remain secret and will incur immeasurable harm if its trade secrets are disclosed to anyone. Moreover, Davidson knew that he was in breach of the Proprietary Information

Agreement when he failed to return to Diamond Power the information that he copied to the zip drive. Where, as here, Davidson has chosen to expressly ignore his legal duties to Diamond Power, the balance of equities favors granting of injunctive relief.

E.     Temporary Injunctive Relief Will Not Disserve the Public Interest.

The public interest is best served by requiring persons to compete fairly rather than by using unlawful means to divert a competitor's employees and business. See Specialty Chems. & Servs., Inc., 1998 WL 618583, at *6 ("Certainly, there is a cognizable public interest in discouraging employees from succumbing to the temptation of easy profit by breaching their employer's trust and misappropriating proprietary information for their own gain."). The public interest is also best served by requiring parties to honor their enforceable contractual obligations. Conversely, the public will suffer no harm if Davidson is made to abide by his Proprietary Information Agreement and to continue in his employment with Clyde Bergemann without using, or the opportunity to use, Diamond Power's confidential information and trade secrets. Thus, rather than disserving the public's interest, the entry of the requested temporary injunctive relief would serve the public's interest and should be granted.

III.   CONCLUSION

Accordingly, for all of the reasons set forth above and in Diamond Power's Complaint, Diamond Power respectfully requests that the Court grant its Motion for a Temporary Restraining Order or interlocutory injunction.  A proposed order granting the relief sought is attached hereto for the Court's convenience.[7]

Respectfully submitted this 14th day of January, 2004.

ALSTON & BIRD LLP

By: _____
Warren R. Hall, Jr.
Georgia Bar No. 319405
Allison J. Viscardi
Georgia Bar No. 728059
ALSTON & BIRD LLP
1201 West Peachtree Street
Atlanta, Georgia 30309-3424
(404) 881-7000
(404) 881-7777

ATTORNEYS FOR PLAINTIFF
DIAMOND POWER INTERNATIONAL,
INC.

---

[7]     By their signature below, counsel certifies that this brief has been prepared in Times New Roman 14-point font, one of the font and point selections approved by this Court in Local Rule 5.1B, N.D. Ga.

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| DIAMOND POWER INTERNATIONAL, INC. | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | CIVIL ACTION |
| | ) | |
| WAYNE DAVIDSON, | ) | FILE NO. _____ |
| | ) | |
| Defendant. | ) | |
| | ) | |

## TEMPORARY RESTRAINING ORDER

Before the Court is the Plaintiff's Motion for Temporary Restraining Order

and Preliminary Injunction and Incorporated Memorandum of Law in Support

Thereof filed by Plaintiff Diamond Power International, Inc. ("Diamond Power").

A hearing was held, and the parties were heard. The Court finds that Diamond

Power is likely to prevail on its claims that defendant Wayne Davidson

("Davidson") misappropriated property, including trade secrets, from Diamond

Power and that there exists a substantial threat of irreparable harm against

Diamond Power if injunctive relief is not granted. Accordingly and for good cause

shown, the Court orders as follows:

1.  Defendant Wayne Davidson ("Davidson") shall within 24 hours of receipt of this Order return to Diamond Power any and all documents or information, in whatever form including, but not limited to, computer disks or hard drives, which contain information pertaining to Diamond Power's customers, products, prices, production schedules, operations, financial records, or related information, in whatever form it may now exist, including any modified or adapted form and including any and all copies or derivatives thereof.

2.  Davidson shall not make use of on behalf of himself or his current employer nor disclose to anyone not employed by Diamond Power any information contained in documents or computer files retained by Davidson from his employment with Diamond Power which fairly meet the descriptions set forth below:

| File name | Description (date of copy) |
|---|---|
| Financial Statement Generator | Diamond Power 2003 year-to-date balance sheet and income statement (10/14/03). |
| Powertrain | List of all sales of new Powertrain Carriages identifying customers, customer locations, quantity, description of order, and sales price (10/8/03). |
| Ikschd | Diamond Power's IK sootblower production schedule identifying every sootblower produced since March 1998 by customer, date and cost; also includes prospective production schedule for January, February, and _____ 2004 (10/8/03). |
| Cost Markup Multipliers | List of Diamond Power multiplier formulae for setting prices of non-standard priced equipment (10/8/03). |
| DPSC Georgia Power | Diamond Power's parts price list for customer Georgia Power Co. (10/8/03). |
| Eastman Chemical, Tennessee | Diamond Power's parts price list for customer Eastman Chemical Co.'s Tennessee facility (10/8/03). |
| Allegheny 8.03 | Diamond Power's parts price list for customer Allegheny Energy (10/8/03). |

3.  Davidson shall not alter, erase, delete, or destroy any computer, computer drive, or computer disk or other information containing medium currently in his possession, custody or control or in any other way spoliate evidence pertaining to his retention or appropriation of documents or information from Diamond Power.

4.  Davidson shall produce to counsel for Diamond Power within 24 hours of Davidson's receipt of this Order, or notice of the existence of this Order, any computer or other information storing medium, including disk drives, hard drives, and computer disks, specifically including any external zip drives, owned by him or existing within his position, custody or control so that such items may be examined by a computer forensic examiner to preserve evidence that may be contained thereon.  The forensic examination shall be carried out by an independent examiner who is not an employee of Diamond Power.

So ordered this _____ day of January, 2004.

_____
Judge, United States District Court
Northern District of Georgia

- 4 -

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

DIAMOND POWER INTERNATIONAL, INC.   )
                                              )
            Plaintiff,           )
v.                               )       CIVIL ACTION
                                              )
WAYNE DAVIDSON,                )       FILE NO. _____
                                              )
            Defendant.       )
_____)

## DECLARATION OF C. G. KOKSAL

1.

My name is C.G. ("Jeff") Koksal and I am of legal age and competent to give this sworn testimony. The facts stated herein are known by me to be true based on my personal knowledge.

2.

I am currently employed with Diamond Power International, Inc. as General Manager of Sales and Service. I have held this position since April 1996.

3.

Diamond Power is in the business of providing boiler cleaning systems and products primarily to the pulp and paper, chemical, and electric utility industries. The cleaning systems, called "sootblowers," and their related systems are designed to keep industrial boilers operating at peak efficiency.

4.

From June 2002 until his separation from employment effective October 31, 2003, I was the direct supervisor of Wayne Davidson. Soon after Mr. Davidson began


EXHIBIT A

reporting to me, he was named to the position of Manager of U.S. Service Center Operations for Diamond Power. Mr. Davidson held this position until his separation from employment with the company. In this position, Mr. Davidson was responsible for supervising Diamond Power's three service centers located in metropolitan Atlanta, Chicago, and Seattle.

5.

Diamond Power's regional service centers provide maintenance and rebuilding services for sootblowers and related equipment. As Manager of U.S. Service Center Operations, Mr. Davidson was a point of centralized control over all three service centers facilities in the United States and reported directly to me. In this capacity, Mr. Davidson was responsible for operational performance and expense control for each of the service centers, managing inventory levels at the service centers, and assisting in the sales process to provide customers of Diamond Power with analysis and recommendations evaluating alternatives to new equipment purchases including evaluating rebuilding and maintenance programs offered by Diamond Power through its service centers.

6.

On or about September 30, 2003, I received notice from Mr. Davidson of his intent to "retire" from his employment with Diamond Power effective October 31, 2003. A true and correct copy of the email communication which I received from Mr. Davidson is attached hereto as Exhibit A.

7.

On or about October 14, 2003, I received notice from Mr. Davidson that he would be taking vacation beginning October 16th and continuing through October 27th. Mr.

- 2 -

Davidson's exit interview was held on October 28, 2003, effectively ending his employment for Diamond Power. A true and correct copy of the communication I received from Mr. Davidson to this effect is attached hereto as Exhibit B.

8.

I have reviewed the Declaration of Lou Stang and I am familiar with its contents.

9.

PowerTrain.

The PowerTrain spreadsheet referenced in the Declaration of Lou Stang as having been copied by Mr. Davidson from his Diamond Power laptop computer to an external zip drive used by Mr. Davidson pertains to a new product offering from Diamond Power introduced into the marketplace only in late 2002. Diamond Power's new PowerTrain carriage system is essentially a gearbox transmission for moving sootblower equipment inside of an industrial boiler. Such systems previously built by Diamond Power and other manufacturers require periodic maintenance and have occasionally leaked lubrication fluid. Diamond Power's new PowerTrain carriages are designed for maintenance free operation without added lubricant and represent the latest technology available in the industry.

10.

The PowerTrain document copied by Mr. Davidson to his zip drive in the weeks immediately prior to his "retirement" from Diamond Power contains a list of all sales of new PowerTrain carriage upgrades by Diamond Power since the product's introduction. The spreadsheet actually misappropriated by Mr. Davidson in October 2003 was current as of the end of September 2003. The spreadsheet identifies each customer who had

- 3 -

purchased a PowerTrain carriage upgrade from Diamond Power through September 2003 including the following information: customer name, customer location by city and zip code, description of the products and services to be provided, identification of the quantity of the products and services purchased, the unit selling price, the current status of the purchase, and the date of shipment. The spreadsheet identifies customer purchases of PowerTrain carriage upgrades with unit and total sales volumes. More importantly, the sales reflected on the spreadsheet reflect only the initial purchases by these Diamond Power customers. Based on my experience in the industry and my knowledge of the customers identified on the spreadsheet, each customer identified on the list operates as few as 30 to as many as 80 or more sootblowers which could eventually be rebuilt with PowerTrain carriages in the coming months and years. Thus, the initial sales reflected in this spreadsheet represent only the "tip of the iceberg" of the sales Diamond Power anticipates having in the coming years with just these listed customers.

11.

The information contained in the PowerTrain spreadsheet is confidential to Diamond Power and is subject to strict efforts to maintain its secrecy. The document was originally prepared by Mr. Davidson for distribution to only approximately sixteen (16) top sales and service managers at Diamond Power. The document is protected from unauthorized access by Diamond Power's security measures detailed in Mr. Stang's declaration. The PowerTrain information is not available from any source other than Diamond Power and is not known or available to the public in general or, specifically, to competitors of Diamond Power. The information contained in the PowerTrain spreadsheet would be very valuable to a competitor of Diamond Power who could derive

- 4 -

value from knowing the identity of specific purchasers of Diamond Power PowerTrain

carriage upgrades including the prices paid for the equipment, the quantities purchased,

the dates of purchase, and the description of the type of work and equipment provided by

Diamond Power to the particular customer.  In particular, since each of the customers

identified on the spreadsheet have multiple sootblowers at their facility, the identity of the

customers as purchasers of PowerTrain carriage products and services from Diamond

Power would suggest to a competitor of Diamond Power in possession of such

information that such customers could be targeted for sales opportunities by the

competitor.  Since the spreadsheet identifies the precise prices paid by customers for the

PowerTrain carriages, a competitor would have a distinct advantage in attempting to

subvert Diamond Power's sales opportunities and divert customers' business.

12.

### Financial Records.

I am also familiar with the financial reports referenced in the Declaration of Lou

Stang which were forwarded to an external zip drive by Mr. Davidson prior to his

separation from employment with Diamond Power.  These financial reports, obtained

from, Diamond Power's Oracle database system include 2003 Diamond Power balance

sheets listing and specifically identifying current assets, investments and advances, total

fixed assets, net fixed assets, current liabilities, tax reserves, inter-office accounts

payable, total other liabilities, total long term notes payable, total redeemable preferred

stocks, common stock and other stock holders' equity including current capital, retained

earnings, and current profit statistics.  The Diamond Power income statement report

identifies monthly and year to date financial data through September 2003 revealing

- 5 -

Diamond Power's gross income, total income, gross profit, operating expenses, and net income.

13.

There would be no legitimate business reason for Mr. Davidson to generate or remove such financial reports to an external zip drive unless he intended to misappropriate such information from Diamond Power.

14.

Diamond Power does not disclose its financial information generally or in the detail contained in the referenced documents to any person outside of the company or its parent. None of the information contained in the referenced documents is available to the general public, either on the company's website or otherwise. Information publicly reported by Diamond Power's parent corporation, The Babcock & Wilcox Company ("B&W"), is not broken out by company and is aggregated with the several other companies which are subsidiaries of B&W. Specific information regarding Diamond Power's balance sheet and/or income statement derives value from not being generally known to, or readily ascertainable by, persons outside of the employ of Diamond Power or its parent. Such financial information could be used by competitors of Diamond Power to obtain an unfair advantage over the company and to obtain economic value or return.

15.

IK Production Schedule.

The IK schedule document appropriated by Mr. Davidson, as referenced in the Declaration of Lou Stang, lists Diamond Power's production schedule for its primary line

- 6 -

of sootblowers: the IK. The production schedule document reflects data dating back to March 1998; it also contains prospective schedules for all booked orders for IK sootblowers received through September 2003. The document reveals the identity of the customers for which the sootblowers are being constructed, the specific types of sootblowers ordered, the quantity ordered, the dates of the orders, the ship date, and the prices. This information is not available outside of Diamond Power and is kept confidential by Diamond Power on its internal computer network. A competitor of Diamond Power would derive value from obtaining the IK schedule document because it identifies information about Diamond Power's customers, their needs, the prices they paid, and when they have placed orders for equipment historically. The document also reveals Diamond Power's scheduled production plan so that a competitor can discuss Diamond's future capacity for production and attempt to redirect sales of yet to be purchased products. A competitor could use such information to unfairly compete against Diamond Power by undercutting prices, or offering specialty deals or programs to customers who are in need of sootblowing products and services.

16.

Parts Pricing.

The cost multiplier document copied to his zip drive by Mr. Davidson contains Diamond Power's specific formulae for pricing several categories of replacement and upgrade parts. In short, the document reveals the multiplication factors which Diamond Power applies to the cost of manufacturing a part, component, or assembly to arrive at its sales price. These formulae are used to develop "List" pricing for all replacement and upgrade parts. Examples of the prices lists associated with several such contracts were

- 7 -

also written to Mr. Davidson's zip drive.  These documents are confidential and proprietary to Diamond Power and are kept secret on Diamond Power's internal computer network and shared only with the particular customer to whom they apply.   In particular because much of Diamond Power's business includes custom-made equipment, a competitor could derive value from obtaining these documents because they reveal Diamond Power's cost basis for hundreds of parts, components, and assemblies.  Further, knowledge of Diamond Power's pricing formulae would allow a competitor to consistently offer to sell at prices just under Diamond Power's price for a piece of equipment and thereby obtain an unfair competitive advantage over Diamond Power.

17.

In summary, Diamond Power considers the documents and information which I have referenced herein to be extremely sensitive, confidential, and proprietary trade secrets.  The information includes sales, costs, and customer contact and purchase information which is available in aggregate from no source other than Diamond Power. The information is not disclosed or made available to anyone not employed by Diamond Power or its parent.  A competitor of Diamond Power could obtain a distinct and unfair advantage in the marketplace if the information described herein were made available to it.  The impact of a competitor learning this confidential information, using this information to market and sell its products, and sharing this information with mutual customers would result in permanent, long-term, and irreparable economic damage to Diamond Power's business.

18.

As Mr. Davidson's direct supervisor, I am intimately familiar with his job duties and responsibilities as an employee of Diamond Power. Given that Mr. Davidson appropriated such information to his zip drive during the final month of his employment and only shortly before commencing, or during, a vacation which would extend through the end of his employment, I can comprehend no reason why Mr. Davidson would have acted in such a manner unless he was attempting to retain Diamond Power records to use for his own benefit or the benefit of another employer subsequent to his separation from employment with Diamond Power. There is no legitimate business reason for Mr. Davidson to have transferred a copy of the PowerTrain spreadsheet, the financial statements, the IK production schedule, the cost multiplier formulae document, or the customer parts price lists to a personal external, storage device such as an external "zip" drive.

19.

As a senior level manager of Diamond Power, I am aware that company policy requires all employees to execute a confidential information agreement under which they pledge to maintain the confidentiality of Diamond Power's business information, to return same to Diamond Power upon separation from employment, and to not use such information for purposes other than for Diamond Power's business. Mr. Davidson signed such an agreement, a true and correct copy of which is attached hereto as Exhibit C.

- 9 -

20.

In the Proprietary Information and Conflict of Interest Agreement signed by Mr.

Davidson, he pledged that he would "not disclose to anyone outside of B&W, or use in

other than B&W's business, any technical or non-technical information or material which

gives B&W an advantage over others who do not know it . . . relating to the business of

B&W or its subsidiaries, either during or after my B&W employment, except to B&W's

written permission. . . . I further agree that upon termination of my employment with

B&W, all records of proprietary information of B&W including copies thereof in my

possession, whether prepared by me or others will be left with B&W." "B&W" is

defined in the agreement to include Diamond Power as a subsidiary of The Babcock &

Wilcox Company.

21.

I am aware through numerous sources of information that Mr. Davidson is

currently employed with Clyde Bergemann, Inc.  Mr. Davidson was seen representing

Clyde Bergemann at a trade show and Mr. Davidson has contacted several employees of

Diamond Power and confirmed that he is employed with Clyde Bergemann.  I am aware

that Clyde Bergemann operates a facility in the Atlanta, Georgia, metropolitan area.

Clyde Bergemann is a major competitor of Diamond Power; the two companies are

involved in virtually the same lines of business and regularly compete for business

opportunities in the sootblower business.

22.

If Mr. Davidson were to disclose the information in the documents discussed above to his current employer, or if he used the information contained in said documents on behalf of his current employer, Diamond Power would be severely and irreparably harmed. With the information described above, Mr. Davidson and/or his current employer could unfairly compete against Diamond Power for customers and business opportunities in the boiler cleaning industry. Mr. Davidson and/or his current employer could use the information to divert actual and prospective purchase orders from Diamond Power. Further, Mr. Davidson and/or his current employer could use the information to disrupt and permanently damage Diamond Power's actual and prospective customer relationships. It would be impossible to value the full extent of the damage which is threatened by Mr. Davidson's or his current employer's use of the information contained in the documents misappropriated as set forth above.

I declare under penalty of perjury that the foregoing is true and correct. Executed on January _13_, 2004.

C. G. Koksal

## Hill, Patricia A

| | |
|---|---|
| **From:** | Davidson, Wayne F |
| **Sent:** | Tuesday, September 30, 2003 4:33 PM |
| **To:** | Craft, James R |
| **Cc:** | Koksal, Jeff; Competti, Eileen M; Hill, Patricia A |
| **Subject:** | Retirement |

This is to officially advise you that I intend to retire effective 10/31/2003.

Accordingly, request that you advise me of any additional information you may required.

***Wayne Davidson***
**Manager, U.S. Service Centers**
**Telephone 770-938-0860**
**Fax 770-938-6824**
**Cell 770-713-5356**
**e-mail wfdavidson@diamondpower.com**

-----Original Message-----
**From:** Davidson, Wayne F
**Sent:** Tuesday, October 14, 2003 2:35 PM
**To:** Fritz, Terrence; Lewis, Steven; Ross, Bryan
**Cc:** Koksal, Jeff
**Subject:** Vacation

I will be at a customer site on 10/15//03 and on vacation beginning Thursday, October 16th. I will return Monday, October 27th. During my absence Steven Lewis will be responsible for the U.S. Service Center Operations.

***Wayne Davidson***
Manager, U.S. Service Centers
Telephone 770-938-0860
Fax 770-938-6824
Cell 770-713-5356
e-mail wfdavidson@diamondpower.com



GO 3853

## PROPRIETARY INFORMATION AND CONFLICT OF INTEREST AGREEMENT

In consideration of my employment by The Babcock & Wilcox Company or any of its subsidiaries existing during my employment ('B&W');

1. I will not disclose to anyone outside of B&W, or use in other than B&W's business, any technical or non-technical information or material which gives B&W an advantage over others who do not know it (hereinafter referred to as 'proprietary information') relating to the business of B&W or its subsidiaries, either during or after my B&W employment, except with B&W's written permission. Neither will I disclose to B&W or induce B&W to use any proprietary information of others. I further agree that upon termination of my employment with B&W, all records of proprietary information of B&W including copies thereof in my possession, whether prepared by me or others will be left with B&W.

2. I shall disclose promptly in writing to B&W all inventions, including discoveries, concepts and ideas, patentable or not, hereafter made or conceived solely or jointly by me:

   a. (1) during my employment by B&W or
      (2) within one year after termination of my employment, if based on or related to proprietary information of B&W;
      and

   b. which relate in any manner to the business or activities of B&W or its subsidiaries.

3. I agree that in connection with any invention covered by paragraph 2 I will, on request of B&W, promptly execute a specific assignment of title to B&W, and do anything else reasonably necessary to enable B&W to secure a patent therefor in the United States and in foreign countries.

4. During the period of my employment, I will not independently engage in the same or similar line of business or research as that carried on by B&W, or directly or indirectly, serve, advise or be employed by any individual, firm or company engaged in the same or similar line of business or research as that carried on by B&W. I will not engage in any activity whatsoever which will involve a conflict in use of my time as an employee of B&W.

5. Except as set forth below, I have no agreements with, or obligations to, others in conflict with the foregoing and I do not own or have an interest in any patent application or unpatented invention.

6. a. Except as set forth below, I am not a promoter, substantial stockholder, director, employee or officer of or consultant to a business organized for profit, nor will I become a promoter, substantial stockholder, director, employee or officer of or consultant to such a business while employed by B&W without first obtaining the prior written approval of my division or subsidiary head. Should I become a promoter, substantial stockholder, director, employee or officer of, or a consultant to a business organized for profit upon obtaining such prior written approval, I understand that I have a continuing obligation to advise my division or subsidiary head at such time as any activity of either B&W or such other business presents me with a conflict of interest as an employee of B&W.

   b. Should any matter or dealings in which I am now involved or hereafter become involved, on my own behalf or as an employee of B&W, appear to present a possible conflict of interest under the Company policy then in effect, I will promptly disclose the facts to my supervisor so that a determination can be made as to whether a conflict of interest does exist. I will take whatever action is requested of me by B&W to resolve any conflict which it finds to exist.

7. My obligations hereunder may not be changed or modified, released, discharged, abandoned or terminated, in whole or in part except by an instrument in writing signed by an officer of B&W.

EXHIBIT C

GO 3853 (REV.)

8.  This agreement shall inure to the benefit of and be binding upon the heirs, personal
    representatives, successors and assigns of the parties hereto.

9.  Any prior agreements between us relating to patents, trade secrets, proprietary infor-
    mation or conflict of interest with B&W are hereby superseded.

Date _JAN 8 1985_    Employee Signature _Wayne Fred Bourdson_
    (TO BE COMPLETED BY EMPLOYEE)                    (SIGN NAME IN FULL)

Witness _Charles A. Savage_
    _SK. Dict Field Service Mgr._
                                    (NAME & TITLE)

INFORMATION REQUIRED BY PARAGRAPHS 5 AND 6 OF PROPRIETERY INFORMATION AND CONFLICT OF
INTEREST AGREEMENT

List here any items which are exceptions under paragraphs 5 (agreements with or obligations
to others and patents) and 6 (outside interests, possible conflict of interest) of Agreement:

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

DIAMOND POWER INTERNATIONAL, INC. )
                                     )
              Plaintiff, )
v.                               )     CIVIL ACTION
                                       )
WAYNE DAVIDSON,                 )     FILE NO. _____
                                       )
              Defendant. )
_____)

## DECLARATION OF LOU STANG

1.

My name is Lou Stang and I am of legal age and am competent to provide this sworn testimony. I am employed as Manager of Information Technology with Diamond Power International, Inc. I have held this position since 1994 and have been an employee of Diamond Power since 1994.

2.

As Diamond Power's Manager of Information Technology, I am responsible for overseeing aspects of Diamond Power's information technology systems, including the company's internal computer network, and specifically the company's database system called Oracle, as well as the systems, processes, and hardware used by Diamond Power employees to access company computer and information systems.



3.

I am responsible for providing computers and appropriate software to Diamond Power employees so that they may access Diamond Power's internal computer system from within and outside of company offices.

4.

I was responsible for providing to Wayne Davidson a laptop computer purchased and owned by Diamond Power for his use as an employee of Diamond Power. The laptop computer provided to Mr. Davidson by Diamond Power ("the Davidson laptop") allowed Mr. Davidson to access Diamond Power's internal computer network, including the Oracle system, both from within Diamond Power's offices and remotely.

5.

Diamond Power's internal computer network (the "network") is made available to most, but not all, Diamond Power employees. Access is limited to employees who are provided a login and password which permits entry into the network. Such employees are authorized "users" of the network. Each network user is assigned a profile which permits the particular user to access certain applications and drives on the network. All network users are not given access to all areas of the network.

6.

Within Diamond Power's network, the Oracle database system is available to only a limited group of network users. Access to the Oracle system is protected by a user name and password assigned by the information technology department ("IT department"). Only Diamond Power network users with a need to access the Oracle

- 2 -

system are given a user name and password to allow access to the Oracle database. Access to the Oracle system is further limited in that employees are only permitted to access certain portions of the Oracle system to which it has been determined that they need access.

7.

Out of approximately 500 total employees at Diamond Power, less than ¾ are network users. Thirty-four percent (34%) of Diamond Power employees have no access to any portion of the Oracle system. Outside of the accounting department and three (3) employees in the IT department, only eighteen (18) employees of Diamond Power had access to the financial records in Oracle which were misappropriated by Mr. Davidson as recounted below.

8.

In addition to the login and password systems for the protection of access to Diamond Power's computer network and second layer of password and user name protection for access to the Oracle database system, the entire Diamond Power computer network is firewall protected to prevent unauthorized access by unauthorized persons. As an additional level of security, physical access to Diamond Power's operational headquarters in Lancaster, Ohio, where its computer systems are housed, is limited by regulations requiring all employees to wear and display identification badges while in the office. Vistors must identify themselves, sign in, and be accompanied while in the offices. After hours, access to Diamond Power's Lancaster office is controlled by security guards who permit access only upon showing a valid company identification badge.

- 3 -

9.

Diamond Power's network and Oracle database system contains confidential and proprietary information regarding the company's financial data and performance, sales records, and customer identification and contact information. As described above, access to information from the network and the Oracle database is protected by several layers of security protection so that only authorized employees of Diamond Power or its parent have access to data, and only on a need to know basis.

10.

Wayne Davidson was a network user and also a user granted access to the Oracle database system. As the Manager of U.S. Service Center Operations, Wayne Davidson was granted access to all parts of the computer network, including the Oracle system, which were deemed necessary for managers in the sales and service functions at Diamond Power.

11.

Upon his separation from employment with Diamond Power in late October 2003, Mr. Davidson returned to the company the Davidson laptop to me. It is the IT Department's normal practice to examine the status of a laptop computer turned in by a departing employee and we followed this practice with respect to the Davidson laptop. Upon examination, the IT department discovered that significant portions of the email system (e.g. the entire email in-box file and sent items file) and all Word (text) and Excel (spreadsheet) documents from the Davidson laptop had been deleted, erased, or overwritten prior to the return of the computer to Diamond Power. It is very unusual for

- 4 -

an employee separating employment with Diamond Power to delete such data and files from his or her company-owned laptop computer.

12.

Diamond Power commissioned a forensic computer examination of the Davidson laptop after his return of it upon his separation from employment with Diamond Power. I have reviewed the computer files and data retrieved by the forensic computer examination performed by K&F Consulting in Atlanta, Georgia. The data retrieved from the Davidson laptop reveals that Mr. Davidson accessed data, records, and documents stored on the Diamond Power network, the Oracle system, or the Davidson laptop and copied or somehow transferred files to an external "zip" drive attached to, but external from, the Davidson laptop. An external zip drive is a means of storing data or information outside of the computer hard drive itself. Diamond Power did not provide an external zip drive to Mr. Davidson for his use as an employee of Diamond Power, so the zip drive must have been acquired by Mr. Davidson from some source other than Diamond Power. Mr. Davidson did not turn in an external zip drive to Diamond Power as part of his computer equipment when he turned in the Davidson laptop.

13.

By copying files and documents to his external zip drive, Mr. Davidson would retain access to the information after returning the Davidson laptop to Diamond Power and after Mr. Davidson could no longer access Diamond Power's computer network or Oracle system. In short, by copying information to his zip drive, Mr. Davidson could retain access to and use of the information after his separation from employment. Among

- 5 -

the files, records and data accessed and copied to his zip drive by Mr. Davidson are the

following:

| File name | Description (date of last access on zip drive) |
|---|---|
| Dpii.balance.txt<br><br>DPII.incomeI.txt | Diamond Power 2003 year-to-date balance sheet and income statement (10/14/03). |
| Powertrain.xls | List of all sales of new Powertrain Carriages identifying customers, customer locations, quantity, description of order, and sales price (10/13/03). |
| Ikschd.xls | Diamond Power's IK sootblower production schedule identifying every sootblower produced since March 1998 by customer, date and cost; also includes prospective production schedules for all placed orders (10/9/03). |
| Cost Markup Multipliers.doc | List of Diamond Power multiplier formulae for setting prices of non-standard priced equipment (10/8/03). |
| DPSC [*customer A*].xls | Diamond Power's parts price list for *customer A* (10/8/03). |
| [*customer B*].xls | Diamond Power's parts price list for *customer B* facility (10/8/03). |
| [*customer C*] 8.03.xls | Diamond Power's parts price list for *customer C* (10/8/03). |

I declare under penalty of perjury that the foregoing is true and correct.  Executed

on January _12_ , 2004.

Lou Stang

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

DIAMOND POWER INTERNATIONAL, INC. )
 )
    Plaintiff, )
 )  CIVIL ACTION
v. )
 )  FILE NO. _____
WAYNE DAVIDSON, )
 )
    Defendant. )
_____)

## DECLARATION OF GREGORY L. FORDHAM

1.

My name is Gregory L. Fordham and I am of legal age and competent to give this sworn testimony. The facts stated herein and are known by me to be true based upon my personal knowledge.

2.

I am a principal with K&F Consulting, Inc. which is a computer consulting firm located in Atlanta, Georgia. A true and correct copy of my current curriculum vitae is attached hereto as Exhibit A. I have been professionally performing forensic computer analysis services since January 2001.

3.

K&F Consulting received a laptop computer from Diamond Power International, Inc. and was requested to conduct a forensic examination of the computer in an attempt to retrieve deleted, erased, or overwritten computer files.



EXHIBIT C

4.

I conducted a forensic analysis of the computer as requested using specialized software designed to analyze the computer's contents and retrieve and detect deleted, erased, or overwritten computer files.

5.

Data on the laptop computer which we examined revealed that during October 2003, five thousand and eighty-one (5,081) files or folders were deleted from the computer. During September 2003, two thousand four hundred and sixty-three (2,463) files or folders were deleted from the computer. During the four-month period from May 1, 2003 through August 31, 2003, only one thousand two hundred and thirty-one (1,231) files or folders were deleted from the computer.

6.

I delivered to Lou Stang at Diamond Power a listing of all of the computer files and folders which we were able to retrieve and detect from the laptop computer.

7.

While I was able to retrieve a number of files which had been deleted or erased from the laptop computer I examined, there was a quantity of information contained within files and folders on the laptop which could not be retrieved. Depending on how it is carried out, it is possible to quickly and permanently delete, erase, overwrite or otherwise render inaccessible vast numbers of computer files and folders. If successfully done, such information cannot be retrieved by any methodology of which I am aware.

- 2 -

8.

It also is possible that certain files or folders on a computer such as the laptop at issue could be covertly deleted, erased, overwritten, or otherwise rendered inaccessible in a way in which it would be impossible to detect or prove that such actions were carried out.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on January 1 6, 2004.

Gregory L. Fordham

- 3 -

CURRICULUM VITAE
OF
GREGORY L. FORDHAM, CPA, CIA

Principal, K&F Consulting, Inc.
1303 Hightower Trail, Suite 315
Atlanta, GA 30350
770-642-0311 (voice)
770-642-9913 (fax)
greg@knfcon.com (e-mail)

<u>Education</u>
- Bachelor of Business Administration (BBA), concentration in accounting, Emory University (1981)
- Associate of Arts (AA), Oxford College of Emory University (1979)

Professional <u>Certifications</u>
- Certified Public Accountant (CPA), Commonwealth of Virginia
- Certified Internal Auditor (CIA)

## WORK HISTORY

**Jun 1991 - Present**

**Principal, K&F Consulting, Inc.,** Atlanta Georgia. - Since its founding in 1991 K&F has provided numerous services to contractors and attorneys including claims and terminations, cost structures, disclosure statements, policies and procedures, compliance matters and proposal preparation. Often these projects involved acquisition, analysis and production of electronic data to prove entitlement, causation or quantum. Prior to 2001 K&F's services were provided exclusively in the field of government contracts. Since 2001, however, Mr. Fordham's expertise in computerized systems has expanded the application of his skills to many areas outside the field of government contracts ranging from large, complex construction litigation to smaller family law matters, as well as, employment law, bankruptcy and anti-trust litigation.

**Apr 1988 - May 1991**

**Consultant, T. A. Carlson & Company,** Springfield, VA. - Provided consulting services to Fortune 500 companies in the field of government contracts. Services typically involved claims and terminations, cost structures, disclosure statements, policies and procedures, compliance matters and proposal preparation.

**Apr 1987 - Apr 1988**

**Consultant, Seidman & Seidman,** (now BDO/Seidman) Washington D.C. - Provided consulting services to contractors and attorneys in the field of government contracts. Services typically involved claims and contract terminations.

**Aug 1984 - Apr 1987**

**Staff Auditor, Central Intelligence Agency,** Washington, D.C. - Served almost 2 years in the Office of Inspector General performing operational audits of agency activities. Served 1 year in the Office Finance performing pre and post award audits of agency contractors.

EXHIBIT A 

CURRICULUM VITAE OF GREGORY L. FORDHAM

| Oct 1983 - Aug 1984 | **Staff Accountant, Brooks & Brooks**, Certified Public Accountants, Atlanta, GA - Prepared tax returns and compilation reports for various businesses, as well as, other financial and computer consulting services. |
|---|---|
| Feb 1983 - Sep 1983 | **Staff Accountant, Owens & Stern**, Certified Public Accountants, Atlanta, GA - Prepared tax returns and compilation reports for various businesses, as well as, other financial and computer consulting services. |
| Apr 1982 - Feb 1983 | **Owner, Construction Consultants International**, Atlanta, Ga - Performed accounting and tax services for various businesses |
| Jul 1981 - Mar 1982 | **Controller, Palace Industries**, Atlanta, GA - Palace Industries was a home improvement contractor working in 6 southeastern states. As controller I was responsible for all accounting and financial operations such as preparation of monthly financial statements, job cost reports, weekly payrolls, etc. |
| Jun 1980 - Aug 1980 | Mid Western Distributions, Ft Scott, KS - Summer job as over-the-road tractor trailer driver covering lower forty-eight states |
| Pre 1980 | Summer jobs in family owned construction business. Experiences included structural and ornamental steel fabrication and erection, precast concrete panel manufacture, operation of heavy equipment, pile driving superintendent, project management and claim settlement. |

## PROGRAMMING LANGUAGES

| Current Computer Languages | Borland Delphi, SQL |
|---|---|
| Prior Computer Languages | Borland ObjectPal, dBase, Rbase, Borland Quattro, Lotus 1-2-3, Nomad, Ramis, GEMS, REXX, Fortran, Cobol, Basic, Z-80 Assembler |

## WRITINGS

| Published Articles | *Electronic Format Superior for E-Mail Production*, Digital Discovery & e-Evidence, Vol.3 No. 11, November 2003, Pike & Fischer, Inc., a subsidiary of The Bureau of National Affairs, Inc. |
|---|---|
| | *Commercial Items: A New Frontier*, Government Contracts Service, May 30, 1996, Number 10-96, Procurement Associates |
| | *FAS 121 and the Interim FAR Rule: Sound Strategies for Avoiding or Minimizing an Impairment Loss*, Federal Contracts Report, April 29, 1996, Vol. 65, No. 17, Bureau of National Affairs |
| | *Wickham Contracting: A Holocaust*, The Clause, December 1995, The Board of Contract Appeals Bar Association |
| | *The New World Order*, Contract Management, January 1993, The National Contract |

CURRICULUM VITAE OF GREGORY L. FORDHAM

Management Association

*Determining Defense Contract Unallowable Costs Under CRAG*, Internal Auditing, Winter 1990, Vol. 5, No. 3, Warren, Gorham & Lamont.

*Auditing Unallowable Costs of Federal Government Contractors*, Internal Auditing, Summer 1989, Vol. 5, No. 1, Warren, Gorham & Lamont.

*MRP and the DoD Solution*, Contract Management, October 1988, The National Contract Management Association.

*Computerized Job Cost Considerations for Government Contractors*, Contract Management, March 1988, The National Contract Management Association.

*The Gleam and Glitter of Cost Reimbursable Contracting*, The Certificate, January 1988, The District of Columbia Institute of Certified Public Accountants.

| | |
|---|---|
| Articles Submitted for Publication | *The Case Against Offsets When Pricing Changes and Delay Claims in Federal Government Contracts*, (2003) |

Articles not Published

*Electronic Data Discovery Unleashed*, http://www.knfcon.com/LIBRARY/PRIMERS/EDDU.pdf, (2001, 2002)

*How to Get Rich with Electronic Data Discovery*, www.knfcon.com/LIBRARY/PRIMERS/GetRich.pdf (2002)

*Contract Changes and Claims*, http://www.knfcon.com/LIBRARY/PRIMERS/claims.htm (1994)

*Terminations For Convenience*, http://www.knfcon.com/LIBRARY/PRIMERS/t4c.htm (1993)

*Cost Accounting Standards*, http://www.knfcon.com/LIBRARY/PRIMERS/cas.htm (1992)

*Employee Drug Testing under FAR Section 223.7500*, http/www.knfcon.com/LIBRARY/PRIMERS/KFDrugTesting.pdf (1989)

## SPEAKING

American Bar Association Construction Forum, Annual Meeting, May 2003

Electronic Data Discovery

Montgomery County Maryland Bar Association, Annual Meeting, May 2003

Electronic Data Discovery

American Bar Association Transportation MegaConference, April 2003

Electronic Data Discovery

Law Seminars International, IT Litigation, December 2002

Electronic Data Discovery

National Employment Lawyers Association, June 2002

Electronic Data Discovery

Construction Industry Section, Atlanta Bar Association, March 2002

Electronic Data Discovery

National Contract Management Association

CURRICULUM VITAE OF GREGORY L. FORDHAM

Frequent speaker to Association Chapters on items of topical interest such as Contract Changes and Claims, Terminations for Convenience, Cost Accounting Standards, Truth-in-Negotiations Act, Material Requirements Planning, Cost Allocation and Recovery, Subcontracting Rules, Commercial Item Acquisition

National Association of Purchasing Managers

Material Requirements Planning

Federal Bar Association

Cost Allocation and Recovery, Contract Delays

Society of Cost Estimating and Analysis, April 1992

Cost Allocation and Recovery

University of Maryland

Cost Allocation and Recovery

## TEACHING

National Education Seminar (NES)

From 1996 to 2001 served on the faculty for the National Education Seminar sponsored by the National Contract Management Association. Subjects presented included; Program and Contract Changes, Commercial Item Acquisition, FAR 15 Rewrite, Contracts Professional as a Business Manager, Award Term Contracting.

## MEMBERSHIPS

National Contract Management Association

Member since 1987 and have served in various leadership capacities including Programs Manager, Treasurer, NES Faculty member and frequent speaker.

Public Contract Law Section, American Bar Association

Associate member since 1990

Litigation Section, American Bar Association

Associate member since 2001

Construction Forum, American Bar Association

Associate member since 2001

Atlanta Bar Association

Affiliate member since 2001

## TESTIFYING EXPERIENCE

2003        Bright Metal Specialties, Inc. v Employers Insurance of Wausau and Rogers Construction Company, Case 32-110-00044-97, American Arbitration Association, Miami FL

## OTHER ACCOMPLISHMENTS

Eagle Scout, combination palms bronze over silver

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

DIAMOND POWER              )
INTERNATIONAL, INC.        )
                           )
          Plaintiff,       )
     v.                    )        CIVIL ACTION
                           )
WAYNE DAVIDSON,            )        FILE NO. 1:04-CV-0091-RWS
                           )
          Defendant.       )
_____)

## CERTIFICATE OF SERVICE

I hereby certify that I have this date served the foregoing Memorandum of

Law in Support of Plaintiff's Motion for Temporary Restraining Order and

Preliminary Injunction on all parties to this action by depositing a copy of the same

in the U.S. mail, regular delivery addressed as follows:

> Wayne Davidson
> 1834 Webb Gin House
> Snellville, Georgia 30078

This the 14th day of January, 2004.

Allison J. Viscardi
Georgia Bar No. 728059

ORIGINAL

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

|  |  |  |
|---|---|---|
| DIAMOND POWER INTERNATIONAL, INC. | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) | CIVIL ACTION |
| WAYNE DAVIDSON, | ) ) | FILE NO. 1:04-CV-0091-RWS |
| Defendant. | ) ) ) ) | |

### CERTIFICATE OF SERVICE

I hereby certify that I have this date served the foregoing Plaintiff's

Motion for Ex Parte Hearing and Relief and Incorporated Memorandum of

Law in support of same on all parties to this action by depositing a copy of

the same in U.S. mail, regular delivery addressed as follows:

Wayne Davidson
1834 Webb Gin House
Snellville, Georgia 30078

This the 14th day of January, 2004.

Allison J. Viscardi
Georgia Bar No. 728059