**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | | |
|---|---|---|
| DIAMOND POWER | : | |
| INTERNATIONAL, INC., | : | |
| | : | |
| Plaintiff, | : | CIVIL ACTION NO. |
| | : | 1:04-CV-0091-RWS-CCH |
| v. | : | |
| | : | |
| WAYNE DAVIDSON, | : | |
| | : | |
| Defendant. | : | |

| | | |
|---|---|---|
| DIAMOND POWER | : | |
| INTERNATIONAL, INC., | : | |
| | : | |
| Plaintiff, | : | |
| | : | CIVIL ACTION NO. |
| v. | : | 1:04-CV-1708-RWS-CCH |
| | : | |
| CLYDE BERGEMANN, INC. | : | |
| | : | |
| Defendant. | : | |

## <u>ORDER</u>

These cases come before the Court on Defendant Wayne Davidson's

Motion for Summary Judgment [68] in Case No. 1:04-CV-0091-RWS-CCH and

Defendant Clyde Bergemann's Motion for Summary Judgment [210] in Case

AO 72A
(Rev.8/82)

No. 1:04-CV-1708-RWS-CCH.  After reviewing the entire record, the Court

enters the following Order.[1]

## Background

Plaintiff Diamond Power International, Inc. ("Diamond Power") alleges

that its former manager of service operations, Defendant Wayne Davidson,

misappropriated various trade secrets for the benefit of Diamond Power's main

competitor, Defendant Clyde Bergemann, Inc. ("Bergemann").  In Case No.

1:04-CV-0091-RWS-CCH, Diamond Power brings claims against Davidson for

misappropriation of trade secrets, violations of the Computer Fraud and Abuse

Act, conversion, breach of fiduciary duty, and breach of contract.  In Case No.

1:04-CV-1708-RWS-CCH, Diamond Power brings claims against Bergemann

for misappropriation of trade secrets, violations of the Computer Fraud and

Abuse Act, conversion, unjust enrichment, tortious interference with business

relations, and tortious interference with contractual relations.  As these cases

come before the Court on Defendants' requests for summary judgment, the

Court considers the evidence in a light most favorable to Diamond Power.

Diamond Power and Bergemann are each in the business of

manufacturing and repairing mechanical systems commonly referred to as

---

[1] Pursuant to its authority under Rule 42(a), the Court consolidates the two actions for the limited purpose of considering the two Defendants' motions for summary judgment.  See FED. R. CIV. P. 42(a).

sootblowers, which are designed to clean massive industrial and utility coal-fire boilers.  They are the two dominant participants in the industry, and as such, are fierce competitors.  Diamond Power manufactures approximately 70% of the industrial sootblowers that are sold in the United States, and Bergemann manufactures most of the remaining 30%.  In addition to manufacturing, each company provides rebuild and repair services and sells aftermarket parts for both its own and its competitor's systems.  Diamond Power and Bergemann have competed since 1988.  (See Pl.'s Counterstatement of Mat. Facts & Resp. to Bergemann's St. of Mat. Facts [257-3] [hereinafter "PSMF"] ¶¶ 1-6, i-ii.)[2]

## I.      Diamond Power's P-Drive and Oracle Networks

At the time of the commencement of this litigation, Diamond Power had approximately 350 employees.  (See Michael Dep. II [240-24] at 231-35.)  With the exception of factory workers, all Diamond Power employees were authorized to access Diamond Power's main network, the "P-Drive," by using a company-issued computer username and password.  (Id. at 218-19.)  The P-Drive network was firewall-protected, and physical security measures were instituted at Diamond Power's various offices to ensure that outsiders could not gain entry.  Diamond Power's employees were required to execute a one-page "Computer Security and Non-Disclosure Agreement," in which they agreed to

---

[2] Unless otherwise noted, the Court's record citations pertain to the filings in Diamond Power v. Clyde Bergemann, No. 1:04-CV-1708-RWS-CCH.

maintain the username and password in a confidential manner and use Diamond Power systems only for authorized purposes.  (See Bergemann's St. of Mat. Facts [257] [hereinafter "DSMF"] ¶ 17; D-0012.)  Nevertheless, neither that agreement nor any other Diamond Power policy restricted Diamond Power employees from transferring electronic documents taken from the P-Drive network to their own personal computers, and it was common for employees to work at home. (DSMF ¶ 19; Stang Dep. at 33-34.)

Diamond Power also maintained a much more restricted network, the "Oracle network," principally for confidential financial record keeping.  The Oracle system was accessible only to a limited group of Diamond Power employees responsible for accounting and financial activities.  These employees were issued a second password in addition to the password assigned to them for access to the P-Drive network.  Diamond Power further restricted access to the Oracle network by permitting those with authorization only to access files containing information necessary to their work tasks.  (PSMF ¶ v-vii.) Approximately eighteen employees had access to the part of the Oracle network at issue in this case.  (Id. ¶ vii.)

## II.   Wayne Davidson's Role at Diamond Power

In 2001, Wayne Davidson was in his seventeenth year as an employee of Diamond Power, and in his eleventh year as manager of one of Diamond

Power's three United States Service Centers. That year, Davidson earned a promotion to the position of Manager of Diamond Power's national service operations.  As Manager, Davidson oversaw the repair and rebuild operations of Diamond Power's three U.S. Service Centers, prepared budgets relating to Diamond Power's service and rebuild operations, set pricing schedules, and managed inventory.  In 2002, Davidson was additionally appointed to manage and oversee the manufacture of a new Diamond Power sootblower system, the PowerTrain.  Through his experience and position at Diamond Power, Davidson developed substantial knowledge of Diamond Power's products and original equipment manufacturer (OEM) parts and was authorized by Diamond Power to access both Diamond Power's P-Drive network and its more restricted Oracle network.

## III.    Davidson Accepts Employment with Bergemann

In September of 2003, Diamond Power's principal competitor, Clyde Bergemann, began looking for an individual to manage its repair and rebuild operations.  At the time, Joey Payne, an employee of Bergemann, was overseeing Bergemann's rebuild and repair operations, but no one formally held the position of Manager of Rebuild Operations.  (Davidson Dep. I at 81-82.) Bergemann hired a headhunter, who in turn contacted Davidson to gauge his interest in the job.  Davidson agreed to meet with Bergemann's Chief Executive

Officer.  On September 21, over a Sunday lunch, Davidson met Bergemann

CEO Hans Schwade and Bergemann Director of Human Resources Daniel

Scheiber, who expressed interest in having Davidson manage Bergemann's

rebuild operations.  Davidson in turn expressed interest in the job.  (Id. at 80-

90.)

Two days later, on September 23, Mr. Scheiber sent Davidson a formal

letter offering Davidson the position of Manager of Rebuild Activities,

reporting directly to Mr. Schwade.  (Ex. 1 to Davidson Dep. III.)  On September

30, Davidson returned a letter to Mr. Scheiber accepting Bergemann's offer of

employment to begin on Monday, November 3, 2003.  (Ex. 2 to Davidson Dep.

III.)  Later that day, Davidson sent an email to his superiors at Diamond Power,

informing them that he was planning to "retire" effective October 31.[3]

(Davidson Dep. I at 69.)

For the next month, Davidson continued in his role as Diamond Power

Manager of U.S. Service Centers, and took several weeks of vacation in

between.  He mentioned to several co-workers that he planned to retire, and did

---

[3] At his initial deposition, Mr. Davidson testified that he had not yet decided to work for Bergemann at the time he emailed his resignation letter: "I had not received a formal offer, nor had I accepted any formal offer at that point in time."  (Davidson Dep. I at 70.)  In a later deposition, however, after being confronted by Plaintiff's counsel with his signed acceptance letter dated September 30, Mr. Davidson admitted that he accepted Bergemann's offer of employment that day, immediately prior to informing his Diamond Power superiors of his plans to "retire." (Davidson Dep. III at 15-17.)

not disclose at any time in the month leading to his departure that he had

accepted a management position with Diamond Power's principal competitor.

(Davidson Dep. I at 96-102.)  Instead, Plaintiff claims, under the guise of

retirement, but as an agent of Bergemann, Davidson began using his access at

Diamond Power to extract sensitive accounting, financial, and product

information for the benefit of Bergemann.

## IV.   Davidson Downloads Diamond Power Financial Information, Has Lunch with Bergemann CEO

On the day that Mr. Davidson accepted employment with Bergemann,

Davidson downloaded from Diamond Power's restricted Oracle network an

electronic file he titled "Cost.Data," containing a detailed report of the cost,

materials, and labor and overhead cost components for approximately 20,000

Diamond Power parts by part number.  (PSMF ¶¶ xliv-xlv.)  In similar fashion,

he copied a 500-page document referred to by the parties as the Bill of

Materials Structure Report ("BOM Report"), which identified virtually all

Diamond OEM parts by part number and the assembly sequence necessary to

perform a rebuild to Diamond's specification.[4]  (Id. ¶ xxvi.)  He transferred both

files from Diamond's computer system to a portable hard disk (a "zip drive"),

and then later that day transferred the files to his home computer.

---

[4] Davidson originally generated the BOM report by accessing Diamond Power's restricted Oracle Database on September 25, two days after he had been formally offered the position at Bergemann.

AO 72A
(Rev.8/82)

Several weeks later, on October 21, Davidson met with CEO Schwade for lunch.[5]  A day earlier, Mr. Schwade had sent an email to his European superiors speculating on the internal design of Diamond Power's PowerTrain system.  "From what we can put together and heard so far," Mr. Schwade reported to his superiors, "the changes [instituted by the PowerTrain design] are the following . . . ceramic silicon nitride hub bearing (all other bearings are conventional), no oil or grease[,] hardened bevel gears with dry film lubricant (molybdenum?)[,] no lubricant oil or grease in the hub . . . ."  (Ex. 38 to Schwade Dep. III.)  The next day, however, after Mr. Schwade's lunch meeting with Davidson, his understanding of the PowerTrain system significantly improved.  In an email sent to his superiors later that day, he wrote, "I have been told that [the PowerTrain bearing] has a graphite cage that provides lubrication to the balls and otherwise is a standard roller bearing.  It apparently was first used by Diamond Superior in Sweden and said to be in service for 50,000 hours . . . ."  (Ex. 41 to Schwade Dep. III.)

---

[5] Mr. Schwade initially denied having any contact with Davidson during the remainder of Davidson's employment term with Diamond Power.  Nevertheless, at a later deposition, when confronted with several emails authored by Mr. Schwade on October 21, 2003, Mr. Schwade indicated that he simply had "no recollection" of having lunch with Davidson or speaking with Davidson.  Mr. Schwade's emails indicate that he made an inquiry concerning Davidson's immediate availability that day, and then later indicated that "I'll meet him 12:30 today for lunch."  (Exs. 39 & 40 to Schwade Dep. III.)

On the same day as his lunch with Mr. Schwade, Davidson returned to work at Diamond Power and accessed Diamond Power's Oracle system. Davidson requested five "Invoiced Order Summary" reports ("IOS Reports"), which identified virtually all domestic U.S. customers of Diamond Power and the total amount of each customer's purchases for the period of time covered by the report. The reports are generated by specific queries to the Diamond Oracle system and were generated to include information covering Diamond Power's transactions over the previous one-year period.[6] Davidson copied the five IOS reports to a zip drive and later transferred them to his home computer. (PSMF ¶¶ xv-xxii.)

Over the next few weeks, Davidson copied several other files from Diamond Power's main network drive and later transferred them to his home computer, using a zip disk. The record reflects that on October 3, Davidson copied the Diamond Hardware Book file, containing details and specifications of virtually all parts and systems sold by Diamond Power. (PSMF ¶ lxxxviii.)

---

[6] Davidson initially denied intentionally generating the five IOS Reports on October 21, testifying that "I didn't on the 21st physically access the Oracle system . . . to run this report. I mean, it ran – ran automatically." (Davidson Dep. I at 165.) But in a later deposition, Davidson retracted that testimony, and offered instead that he intentionally accessed the report to "create a portion of my monthly . . . report," and to discuss how to analyze such a report with Steven Lewis, a manager of one of Diamond Power's U.S. Service Centers (Davidson Dep. III at 195-96.) Mr. Lewis, however, testified that he was familiar with IOS Reports and that he does not recall having such a conversation with Davidson in October of 2003. (Lewis Dep. at 67-68.)

Plaintiff also copied the Cost Markup Multipliers document ("CMM"), which

contained a formula for predicting Diamond Power pricing for all aftermarket

parts and products, based on the data contained in the Cost Data Report.

(PSMF ¶¶ lvii-lviii.)  Davidson copied and transferred that file on October 8,

2003.  (Id. ¶ lxiii.)  He also maintained a compact disk containing an electronic

library of Parts Identification Forms, an electronic library of Field Weld

Instructions, and the Parts Identification Configurator, used to match up the

parts required for specific Diamond Power sootblower systems.

In late October, Davidson's employment with Diamond Power was

coming to an end.  Prior to returning his company laptop, Davidson attempted

to delete all data files, including emails, spreadsheets, and documents.

(Davidson Dep. I at 139-40.)  Despite having recently copied the numerous

electronic files noted above onto his home computer, Davidson also certified in

writing at an exit interview that he did not have in his possession, nor fail to

return, "any specifications, drawings, blueprints, reproductions, sketches, notes,

reports, proposals, or copies of them or other documents or materials, tools,

equipment or other property belonging to Diamond Power International, Inc."

(Ex. 4 to Davidson Dep. I.)

## V.      Diamond Power Info is Uploaded to Bergemann's Computer System

In early November, Davidson began work with Bergemann.  Immediately

thereafter, he uploaded a file containing the IOS Reports, the BOM Report, the

Cost Data Report, the CMMs, the Hardware Book file, the PI Forms Library,

the FWI Library, and the PI Configurator to an electronic file he created on the

Bergemann computer network and named "Diamond Info."  After Davidson

uploaded the "Diamond Info" file, Davidson informed Mr. Payne, a Bergemann

service operations supervisor, of the location of the "Diamond Info" file.  As a

result of this conversation, Mr. Payne copied the "Diamond Info" folder and

placed it onto his own user directory.  (Payne Dep. at 71-75.)  Mr. Payne admits

to copying the "Diamond Info" folder and accessing it for the benefit of

Bergemann.  (Payne Dep. at 86-88.)

On November 13, 2003, Bergemann CEO Schwade sent his supervisors

in Europe an email stating that "I have received the following information about

Diamond's sales for the past 12 months from September last year to October

this year," and containing figures of Diamond Power's new business revenues

and revenues from services.  The time period matches the period reflected on

the IOS Reports generated by Davidson on October 21, 2007, and later

uploaded onto the Bergemann system.[7]  (PSMF ¶ xxiv.)

---

[7] When asked at his deposition where he received this non-public information, Mr. Schwade could not recall.  (Schwade Dep. III at 253-54.)

Moreover, on December 21, 2003, Davidson sent an email containing the CMM Report to several Bergemann employees who were responsible for parts pricing. Bergemann made certain aftermarket parts pricing changes in late 2003 and early 2004, and experienced an increase in its gross margin for aftermarket parts. (PSMF ¶ lxxiv.) Diamond Power claims that Bergemann's sales in aftermarket parts and services grew approximately $4 million in year 2005, and its own sales correspondingly declined by approximately $2 million. These actions followed.

## Discussion

Both Davidson and Bergemann move for summary judgment on all of Diamond Power's claims. After reviewing the summary judgment standard, the Court discusses each of Diamond Power's claims in turn.

## I.      Summary Judgment Standard

Federal Rule of Civil Procedure 56 requires that summary judgment be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). "The moving party bears 'the initial responsibility of informing the . . . court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.'" Hickson Corp. v. N. Crossarm Co., 357 F.3d 1256, 1259 (11th Cir. 2004) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986) (internal quotations omitted)).  Where the moving party makes such a showing, the burden shifts to the non-movant, who must go beyond the pleadings and present affirmative evidence to show that a genuine issue of material fact does exist.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 257, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

The applicable substantive law identifies which facts are material.  Id. at 248.  A fact is not material if a dispute over that fact will not affect the outcome of the suit under the governing law.  Id.  An issue is genuine when the evidence is such that a reasonable jury could return a verdict for the non-moving party. Id. at 249-50.

In resolving a motion for summary judgment, the court must view all evidence and draw all reasonable inferences in the light most favorable to the non-moving party.  Patton v. Triad Guar. Ins. Corp., 277 F.3d 1294, 1296 (11th Cir. 2002).  But, the court is bound only to draw those inferences which are reasonable.  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial."

Allen v. Tyson Foods, Inc., 121 F.3d 642, 646 (11th Cir. 1997) (quoting

Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.

Ct. 1348, 89 L. Ed. 2d 538 (1986)).  "If the evidence is merely colorable, or is

not significantly probative, summary judgment may be granted."  Anderson,

477 U.S. at 249-50 (internal citations omitted); see also Matsushita, 475 U.S. at

586 (once the moving party has met its burden under Rule 56(c), the

nonmoving party "must do more than simply show there is some metaphysical

doubt as to the material facts").

　　　With these standards as a foundation, the Court turns to address the

merits of Defendants' Motions for Summary Judgment.

## II.    Trade Secrets Claims

　　　Diamond Power alleges that Davidson, as an agent of Bergemann,

misappropriated nine trade secrets from Diamond Power: (1) Invoiced Order

Summary Reports ("IOS Reports"); (2) the Bill of Materials Report ("BOM

Report"); (3) the Cost Data Report; (4) the Cost Markup Multipliers ("CMMs");

(5) the Hardware Book file; (6) the electronic library of Parts Identification

Forms ("PI Forms Library"); (7) the electronic library of Field Weld

Instructions ("FWI Library"); (8) the Parts Identification Configurator ("PI

Configurator"); and (9) information concerning the design of the PowerTrain

product.  (Pl.'s Opp. at 2-31.)  Bergemann and Davidson move for summary

judgment on Diamond Power's trade secret claims, contending that (1) some of the above information does not comprise a trade secret; (2) and, in any event, none of the above information was "misappropriated" by Davidson and/or Bergemann.

The Georgia Trade Secrets Act ("GTSA"), O.C.G.A. § 10-1-760 <u>et seq.</u>, provides that a plaintiff may recover damages for the misappropriation of trade secrets upon proof that (1) it possessed a trade secret, and (2) the opposing party misappropriated it.  O.C.G.A. § 10-1-763; <u>see</u> <u>generally</u> <u>Capital Asset Research Corp. v. Finnegan</u>, 160 F.3d 683, 685 (11th Cir. 1998); <u>Camp Creek Hospitality Inns, Inc. v. Sheraton Franchise Corp.</u>, 139 F.3d 1396, 1410 (11th Cir. 1998).

## A.    Status as Trade Secret

Whether information deserves protection as a trade secret is a question of fact.  <u>Insight Tech., Inc. v. FreightCheck, LLC</u>, 633 S.E.2d 373, 380 (Ga. Ct. App. 2006) (citing <u>Camp Creek Hospitality</u>, 139 F.3d at 1410-11).  To prove the existence of a trade secret, the plaintiff must show that it possessed information—which may include technical or nontechnical data, financial plans, customer lists, a product design, or product plans—that derives economic value from not being generally known or readily ascertainable to others, and that "is

the subject of efforts that are reasonable under the circumstances to maintain its secrecy."  O.C.G.A. § 10-1-761(4).[8]

Information that has been publicly disclosed, such as through the sale or disclosure to customers, is not protected by the GTSA.  Roboserve, Ltd. v. Tom's Foods, Inc., 940 F.2d 1441, 1454 (11th Cir. 1991).  Because the information has been placed into the public domain, any "reasonable expectation of secrecy" is destroyed.  Id.; see also Monumental Props. of Ga., Inc. v. Frontier Disposal, Inc., 282 S.E.2d 660, 663-64 (Ga. Ct. App. 1981) ("A property right in the unpatented product is only exclusive until it becomes the property of the public by being placed on the market.").  Thus, where the plaintiff has distributed to its customers schematic diagrams, repair instructions,

---

[8] The GTSA defines a "trade secret" as follows:

> [I]nformation, without regard to form, including, but not limited to, technical or nontechnical data, a formula, a pattern, a compilation, a program, a device, a method, a technique, a drawing, a process, financial data, financial plans, product plans, or a list of actual or potential customers or suppliers which is not commonly known by or available to the public and which information:
>
> (A)   Derives economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and
>
> (B)   Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

O.C.G.A. § 10-1-761(4).

product manuals, or similar information—even if they are labeled "proprietary" or "confidential"—the plaintiff's failure to maintain its secrecy precludes trade secret protection.  <u>Servicetrends, Inc. v. Siemens Med. Sys., Inc.</u>, 870 F. Supp. 1042, 1074 (N.D. Ga. 1994) (holding that distribution to customers of medical devices's schematic diagram, repair instructions, manuals, and wiring diagrams, despite being marked "proprietary data" and "confidential," destroyed trade secret protection).

The disclosure of a trade secret to persons with whom the plaintiff has a confidential business relationship, however, generally does not destroy trade secret protection.  <u>Monumental Props.</u>, 282 S.E.2d at 663-64 ("One who by reason of a confidential business relationship with the discoverer has gained possession of his trade secret, will be restrained from betraying the trust reposed in him by using the knowledge he has thus acquired for his own gain.") (citing <u>Outside Carpets v. Industrial Rug Co.</u>, 185 S.E.2d 65, 70 (Ga. 1971)).  Thus, trade secret protection is not destroyed by the "usual situation" in which secret information is shared with employees or other confidants who are legally obligated, by express or implicit agreement or by another duty imposed by law, to maintain its secrecy.  <u>Id.</u>  Even in such a case, however, the plaintiff must demonstrate that it has taken reasonable efforts to maintain its secrecy by not

AO 72A
(Rev.8/82)

widely distributing the information to its employees without proper controls.[9]

See Bacon v. Volvo Service Center, Inc., 597 S.E.2d 440, 443-44 (Ga. Ct. App. 2004) (holding that absence of confidentiality agreements combined with evidence that employees could retain allegedly secret information indefinitely were not reasonable efforts to maintain secrecy as a matter of law).  Moreover, requiring all employees to sign generalized confidentiality agreements is generally not, standing alone, sufficient to demonstrate reasonable efforts. Equifax Servs., Inc. v. Examination Mgmt. Servs., Inc., 453 S.E.2d 488, 493 (Ga. Ct. App. 1994) (holding that requiring all employees to sign confidentiality agreement alone was not reasonable as a matter of law to maintain secrecy of certain information); Amerigas Propane, L.P. v. T-Bo Propane, 972 F. Supp. 685, 700-01 (S.D. Ga. 1997) (same).

Defendants do not dispute for purposes of summary judgment that the (1) IOS Reports, (2) the BOM Report, (3) the Cost Data Report, or (4) the CMMs

---

[9] Defendants, citing several cases which predate the 1990 enactment of the GTSA, contend that the GTSA requires that access to trade secret information be "strictly limited" to only those "to whom information *must be confided*."  (See Defs.' MSJ at 12-13 (emphasis in original).)   See Roboserve, 940 F.2d at 1454-55 (plaintiff "must demonstrate that access to the alleged trade secret has been strictly limited"); Textile Rubber & Chem. Co. v. Shook, 255 S.E.2d 705, 707 (Ga. 1979) (holding that information must be "known only to its owner and those of his employees to whom it must be confided in order to apply it to the uses intended.") The GTSA, however, requires only that the information "[i]s the subject of efforts that are *reasonable* under the circumstances to maintain its secrecy." O.C.G.A. § 10-1-761(4) (emphasis added).

are trade secrets under the GTSA.[10]  But, Defendants do contend that the remainder of the alleged trade secrets at issue—(5) the Hardware Book file, (6) the PI Forms Library, (7) the FWI Library, (8) the PI Configurator, and (9) information concerning the design of the PowerTrain product—are not trade secrets because they were either not subject to reasonable efforts to maintain their secrecy or were readily ascertainable by others.[11]  Within the framework provided above, the Court turns to examine whether any of these five articles of information do not constitute trade secrets as a matter of law.

### 1.   Hardware Book File

The Hardware Book file is a 900-page electronic document containing an extensive list of approximately 35,000 parts and raw materials used in Diamond Power sootblower equipment.  It provides, by part number, a description of each part, including, where appropriate, its dimensions, material specifications, heat treatment, vendor and other special requirements.  Diamond Power regularly updated its Hardware Book file, and its employees regularly used it to provide repair services for its customers.  (See Pl.'s Opp. [256] at 19.)

_____

[10] Although the record reflects that the CMMs document was maintained on Diamond Power's P-Drive network, Defendants do not contend in their summary judgment papers that it does not constitute a trade secret under the GTSA.  (See Defs.' Mot. for Summ. J. at 8-9.)

[11] Defendants do not appear to contest that the information at issue derives economic value from not being available in the public domain.

Diamond Power did not disclose the file to any individuals other than its employees.

Defendants contend that the Hardware Book file is not a trade secret under the GTSA because Diamond Power failed to take reasonable efforts to maintain its secrecy.  Unlike the data and software used to generate the IOS Reports, the BOM Reports, and the Cost Data Report—which were secured on Diamond Power's Oracle network and only accessible to select Diamond Power employees who were issued additional passwords—the Hardware Book file was available on Diamond Power's P-Drive and thus accessible to any of the many Diamond Power employees who had computer access.  Furthermore, the Hardware Book file was not marked confidential, and Diamond Power did not promulgate any specific policy to restrict or track the use of the Hardware Book file by employees.  Nor did Diamond Power prevent its employees, such as Davidson, from transferring the Hardware Book file to a compact or portable disk or to their home computers.  It was thus possible for any Diamond Power employee to retain the Hardware File on a personal computer for an indefinite period of time during their employment.

Diamond Power responds that its efforts to maintain the secrecy of the Hardware Book file were reasonable because it (1) required its employees to sign confidentiality agreements that covered "this sort of information," (2) it

was available only to Diamond Power employees on its password- and firewall-protected main network, and (3) because Diamond Power instituted physical security measures to make sure no outsiders could access it.  (Pl.'s Opp. at 30.)

Diamond Power's evidence that it required its employees to sign a general confidentiality agreement upon the commencement of their employment does not alone demonstrate that its efforts to maintain secrecy were reasonable. See Equifax Servs., Inc., 453 S.E.2d at 493 (holding that requiring all employees to sign confidentiality agreement alone was not reasonable as a matter of law to maintain secrecy of certain information); AmeriGas Propane, 972 F. Supp. at 701 (same).  Thus, the Court must examine Diamond Power's additional efforts to determine whether it had a reasonable expectation of secrecy in its Hardware Book file.

The Court acknowledges that the nature of Diamond Power's work required many Diamond Power employees to have access to the Hardware Book file.  Nevertheless, in light of Diamond Power's demonstrated ability to be more restrictive over information which it wished to keep secret, and the availability of other measures to guard its secrecy, the Court concludes that no reasonable trier of fact could determine that Diamond Power exercised reasonable efforts under the circumstances to maintain the secrecy of the Hardware Book file. Notably, Diamond Power has failed to introduce any evidence that it (1) labeled

the file confidential or otherwise communicated the confidentiality of the Hardware Book file directly to its employees, (2) directed its employees to maintain the secrecy of the file (other than through a general confidentiality agreement which did not expressly mention the Hardware book file), or (3) tracked or otherwise regulated the use of its Hardware Book file.  Absent these measures, Diamond Power employees could, and apparently did, retain the Hardware Book file on their own computers indefinitely during the course of their employment.  See Bacon, 597 S.E.2d at 443-44 (holding that trial court should have granted motion for judgment as a matter of law where, among other things, evidence showed that employees "were not informed that the information was confidential" and information could be "retained indefinitely" by employees).  In the absence of additional measures, Diamond Power's efforts to maintain the secrecy of the Hardware Book file were not reasonable as a matter of law.  The Hardware Book file thus is not afforded trade secret protection under the GTSA.

Accordingly, insofar as Defendants seek judgment as a matter of law on Plaintiff's claim alleging misappropriation of a trade secret based on the Hardware Book file, their motions are **GRANTED**.

2.    PI Forms Library, PI Configurator, and FWI Configurator

Parts Identification forms are documents Diamond Power provides to its

customers to assist them in determining their requirements for replacement parts. Such forms include "exploded" views of Diamond Power components and identify the parts from which Diamond Power components are assembled. The PI Forms Library is an electronic file collecting all of Diamond Power's updated PI Forms, and is accessible to all Diamond Power employees on the P-Drive. Diamond Power employees access the PI Forms Library to in turn distribute product-specific PI Forms to Diamond Power customers. (PSMF ¶¶ xcv, cv). Prior to Davidson's departure from Diamond Power, none of the PI Forms contained markings indicating that they were to be treated as proprietary or confidential, although Diamond Power notes that its contractual terms of sale to customers stipulated that information concerning their products were "disclosed in confidence on the condition that they are not to be reproduced, copied or used for any purpose detrimental to the interest of" Diamond Power. (Id. ¶ cix.) Diamond Power also asserts that it has an unwritten policy which "requires that when a customer requests a PI form, the request is routed through the appropriate sales contact . . . to verify that the customer has actually purchased the equipment for which the PI form is sought. Only after verification is a customer provided a PI form on request." (PSMF ¶ cviii.)

The PI Configurator is an electronic file containing a spreadsheet-based algorithm for matching the correct PI Form with specific equipment

configuration at a given customer site.  (PSMF ¶ 18.)  All Diamond Power employees who had access to the P-Drive had access to the PI Configurator prior to Davidson's departure.  (PSMF ¶ 167.)

Diamond Power's Field Weld Instructions are documents that provide instruction on how to complete welds at customer sites.  Like Diamond Power's PI Forms, they are typically provided to customers who purchase related Diamond Power components.  (PSMF ¶ 170.)  Prior to Davidson's departure, these documents were accessible on the P-Drive to all Diamond Power employees who had computer access.  (Id. ¶ 175.)

The PI Forms Library, the PI Configurator, and the FWI Configurator, like the Hardware Book file discussed above, were stored on Diamond Power's P-Drive.  They were accessible to most Diamond Power employees, were not marked confidential or otherwise use-restricted, and could be, and on some occasions were, possessed indefinitely on remote disks by Diamond Power employees.[12]

What is more, the evidence reflects that Diamond Power distributed over 100 compact disks containing the PI Library, the FWI Library, and, in some instances, the PI Configurator to its field service representatives to be used at

---

[12]   In 2001, Bergemann received a copy of a CD containing the PI Library, the FWI Library, and the PI Configurator from John Bellizia, an employee of Diamond Power that had previously been terminated.  (PSMF ¶¶ 192-193.)

customer sites.  (PSMF ¶¶ 182-190.)  The CDs contained no confidentiality markings and no protection from copying.  Furthermore, no specific instructions concerning confidentiality  accompanied the distribution of those CDs, nor did Diamond Power require their immediate return following use. (Id.)

Having reviewed this evidence, the Court concludes that Diamond Power has failed to demonstrate that it took reasonable efforts to maintain the secrecy of the PI Library, the FWI Library, and the PI Configurator.  The record establishes that Diamond Power provided virtually no guidance to its employees concerning the safe handling of this information, despite its awareness that it was regularly communicated to customers and used at customer sites.  Because the information at issue was widely distributed among its employees, and not restricted from exposure to its customers or others, Diamond Power's efforts do not suffice to afford these files trade secret protection.

Accordingly, insofar as Defendants seek judgment as a matter of law on Plaintiff's claim alleging misappropriation of a trade secret based on the PI Library, the FWI Library, and the PI Configurator files, their motions are **GRANTED**.

3.      Information Concerning PowerTrain

The PowerTrain is a permanently lubricated sootblower carriage that was introduced by Diamond Power in 2002.  Plaintiff asserts that the identity and particular combination of the components selected and used in the development and manufacturing of the PowerTrain, including the types of bearings, the hardness of the bevel gears, the bevel gear coatings, and the types of oils and greases used, are not known to the public or to competitors of Diamond Power. (PSMF ¶ cxxxiii.)  Plaintiffs allege that Davidson disclosed to Bergemann the gear coating treatment, lubricant, and hardening techniques used in the PowerTrain carriage.  (Id. ¶ cxxxvi.)

Defendants contend that information concerning the design of the PowerTrain product is not a protectable trade secret because Diamond Power released the PowerTrain technology into the public domain.  In support of this assertion, Defendants point out that Diamond Power sold over 1,000 PowerTrain carriages between February of 2002 and January of 2005.  (DSMF ¶¶ 65-68.)  During this time, Diamond Power disclosed the type of coating used on the PowerTrain's bevel gears (id. ¶ 86) and disclosed the specific type of grease used in the PowerTrain to at least one customer (id. ¶ 87).  Defendants also point out that the PowerTrain is similar to Diamond Power's IK-525B

carriage, which Bergemann has been rebuilding for decades.  (DSMF ¶¶ 65-68.)

Just because certain or all of the components of a certain product are generally known, however, does not necessarily preclude protection for a combination, compilation, or integration of the individual elements.  Essex Group, Inc. v. Southwire Co., 501 S.E.2d 501, 503 (Ga. 1998) (quoting Restatement (Third) of Unfair Competition § 39(f) (1995)).  Diamond Power responds that, while the PowerTrain *product* was available in the public domain, *information* concerning its specialized components was not publicly available, and Diamond Power derived value out of maintaining its secrecy.  Specifically, Diamond Power offers evidence that on October 20, 2003, Mr. Schwade was not aware, despite his best efforts, of the inner structure and components of the bearing in the PowerTrain.  But after having lunch with Mr. Davidson on October 21, Mr. Schwade knew of its inner structure, components, and service history.  Diamond Power also points out that Bergemann failed in an attempt to reverse engineer the PowerTrain product, further demonstrating that the information Mr. Davidson later disclosed to Bergemann was a trade secret.

Having reviewed this evidence, the Court concludes that a dispute of fact exists concerning whether certain information relating to the design of the

PowerTrain constitutes a trade secret.[13]   Accordingly, insofar as Defendants

move for summary judgment on that basis, their motions are **DENIED**.

### B.     Misappropriation

Having concluded that the Hardware Book file, the PI Library, the FWI

Library, and the PI Configurator are not trade secrets as a matter of law, the

Court turns to examine whether a question of fact exists as to Defendants'

"misappropriation" of the remaining alleged trade secrets at issue—the IOS

---

[13] Defendants argue that Mr. Davidson, if anything, disclosed this information only by way of memory, and thus may not be held to account for misappropriating a trade secret. Although "[a] person who leaves the employment of another has a right to take with him all the skill he has acquired, all the knowledge he has obtained, all the information that he has received," Vendo Co. v. Long, 102 S.E.2d 173, 176 (Ga. 1958), the person may not take protected proprietary information of the employer. Avnet, Inc. v. Wyle Labs., Inc., 437 S.E.2d 302, 304-05 (Ga. 1993). In Avnet, the Georgia Supreme Court held that former employees could use knowledge of *customer* information retained "in their minds" because such information was not protected under the GTSA. The Court distinguished customer *information* from customer *lists*, noting that only the latter is explicitly protected under the GTSA. Id. at 305 ("OCGA § 10-1-761(4) defines a 'trade secret' so as to include certain forms of 'information' without regard to the form that such 'information' might take, but 'customer information' is not specifically included among them."); see O.C.G.A. § 10-1-761(4) (defining trade secret as including "technical or nontechnical data, a formula, a pattern, a compilation, a program, a device, a method, a technique, a drawing, a process, financial data, financial plans, product plans, or a *list of actual or potential customers* or suppliers") (emphasis provided); see also Smith v. Mid-State Nurses, Inc., 403 S.E.2d 789, 790 (Ga. 1991) (employer's customer list held in employee's memory was not protectable as a trade secret).

In this case, unlike in Avnet, Diamond Power does not complain of the misappropriation of customer information. Rather, it contends that the design and technical data of the PowerTrain was misappropriated by Defendants—the type of information that is protected under the GTSA "without regard to the form that information might take." Avnet, 437 S.E.2d at 305.

Reports, the BOM Report, the Cost Data Report, the CMMs, and the information concerning the PowerTrain system.

The second element of a GTSA claim requires the plaintiff to prove misappropriation.  A defendant misappropriates a trade secret when the defendant acquires a trade secret from someone the defendant has reason to know acquired the trade secret by improper means, O.C.G.A. § 10-1-761(2)(A), or when the defendant "discloses or uses a trade secret of another, without express or implied consent, knowing that at the time of disclosure or use the trade secret was acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use." Penalty Kick Mgmt. Ltd. v. Coca Cola Co., 318 F.3d 1284, 1292 (11th Cir. 2003) (citing O.C.G.A. § 10-1-761(2)(B)).[14]

---

[14] The GTSA defines "misappropriation" as follows:

(A)     Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or

(B)     Disclosure or use of a trade secret of another without express or implied consent by a person who:

(i)     Used improper means to acquire knowledge of a trade secret;

(ii)    At the time of disclosure or use, knew or had reason to know that knowledge of the trade secret was:

(I)     Derived from or through a person who had utilized improper means to acquire it;

(II)    Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or

(III)   Derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or

(iii)   Before a material change of position, knew or had

"Acquisition," "disclosure," or "use" of a trade secret is a question of fact.  Id.
at 1292 n.6 (citing Outside Carpets, Inc. v. Indus. Rug Co., 185 S.E.2d 65, 68
(Ga. 1971)).

Defendants argue that Plaintiffs have failed to introduce sufficient
evidence of use or disclosure of a trade secret to withstand summary judgment
on Plaintiff's remaining trade secret claims.  The Court disagrees.

Viewing the evidence in a light most favorable to Diamond Power, the
record reflects that Davidson, immediately after accepting an offer of
employment with Bergemann, exploited his position at Diamond Power to
disclose sensitive and secretive financial, accounting, and product design
information to Bergemann.  As to the information concerning the PowerTrain
design, a reasonable trier of fact could conclude, based on the sudden revelation
by Mr. Schwade to his Bergemann superiors on the day of his October 21 lunch
with Davidson, that Davidson disclosed the PowerTrain information to an agent
of Bergemann.  As to the remaining trade secrets, a reasonable trier of fact
could also conclude, based on the evidence that Davidson uploaded the
"Diamond Power Info" file to Bergemann's network, that Davidson disclosed

reason to know that it was a trade secret and that
knowledge of it had been acquired by accident or
mistake.

O.C.G.A. § 10-1-761(2).

the IOS Reports, the BOM Report, the Cost Data Report, and the CMMs to Bergemann.  At the time of these disclosures, Davidson knew or had reason to know that these trade secrets were acquired under circumstances which gave rise to a duty to maintain their secrecy or limit their use.[15]  See Camp Creek Hosp., 139 F.3d at 1412 (noting that "the GTSA includes the diversion of information acquired under legitimate circumstances within its definition of misappropriation").  Accordingly, a question of fact exists concerning whether Davidson "disclosed" trade secrets in violation of O.C.G.A. § 10-1-761(2)(B)(ii)(II).

Moreover, Diamond Power has come forth with sufficient evidence to establish that Bergemann "used" Diamond Power's trade secrets at a time when it had reason to know that the trade secrets were "derived from or through a

---

[15] Davidson does not genuinely contest for purposes of summary judgment that he initially acquired knowledge of these trade secrets under circumstances giving rise to a duty to maintain their secrecy or limit their use—namely, at a time when Diamond Power placed trust in him to maintain their confidentiality, by granting him high-level access to Diamond Power's financial and accounting systems, cost data, and information concerning the PowerTrain.  In any event, "[w]hether a confidential or fiduciary relationship exists is a matter for the factfinder to decide."  Benson v. McMillan, 581 S.E.2d 707, 710 (Ga. Ct. App.).  Further, the proof required to establish the existence of a duty to maintain secrecy under O.C.G.A. § 10-1-761(2)(B)(ii)(II) need not rise to the level a fiduciary relationship.  Camp Creek Hosp., 139 F.3d at 1411-12 ("Although we have already held that Camp Creek has failed to show that a confidential relationship existed between the parties, the evidence shows that Camp Creek provided the data in question to Sheraton Reservations with the understanding that its use would be limited and that it would be kept confidential."); see also Monumental Props., 282 S.E.2d at 663-64.  Under that standard, it is clear that a dispute of fact exists concerning whether Davidson had a duty to maintain the secrecy of the trade secrets at issue.

person who owed a duty to the person seeking relief to maintain its secrecy or limit its use." <u>See</u> O.C.G.A. § 10-1-761(2)(B)(ii)(III).  As to the information regarding the PowerTrain, the evidence concerning Mr. Schwade's sudden awareness of its components may lead a fact finder to conclude that Bergemann later "used" that information because it likely would improve Bergemann's own efforts to provide rebuild and repair services for PowerTrain systems.  <u>See</u> <u>Penalty Kick</u>, 318 F.3d at 1292 ("There are no technical limitations on the nature of the conduct that constitutes 'use' of a trade secret . . . . As a general matter, any exploitation of the trade secret that is likely to result in injury to the trade secret owner or enrichment to the defendant is a 'use' . . . . [E]mploying the trade secret in manufacturing or production [and] relying on the trade secret to assist or accelerate research or development . . . all constitute 'use.'") (quoting Restatement (Third) of Unfair Competition § 40 cmt. c (1995)).  Likewise, the evidence supports a finding that Bergemann acquired the IOS Reports, the BOM Report, the Cost Data Report, the CMMs with reason to know that Davidson was disclosing that information in contempt of his duty to maintain its secrecy.  The record reflects, for example, Mr. Payne copied these files and placed them in his own user directory, and has testified that use of such information might "benefit" Bergemann.  The coincidental (and convenient) memory loss of several other Bergemann employees concerning

whether such information was accessed or used also creates a triable issue concerning the credibility of their denials.  A question of fact thus exists concerning whether Bergemann "used" this information by comparing it against Bergemann pricing and other financial data to increase profit margins on the sale of aftermarket parts.

Finally, a dispute of fact exists respecting whether Davidson acted as an agent of Bergemann in disclosing trade secrets after accepting a formal position with Bergemann.  In view of the questions concerning the credibility of Mr. Schwade and Davidson's testimony, a jury question exists regarding whether Davidson's acts of misappropriation were "done in the prosecution of [Bergemann's] business; [or] whether the servant was at that time engaged in serving [Bergemann]."  W. Point Pepperell, Inc. v. Knowles, 208 S.E.2d 17, 19 (Ga. Ct. App. 1974); see also Howard v. J.H. Harve Co., 521 S.E.2d 691, 695 (Ga. Ct. App. 1999) ("The test of liability is whether the tort was done within the scope of the actual transaction of the master's business for accomplishing ends of his employment.").

Accordingly, a question of fact exists concerning whether Bergemann "used" or "disclosed" trade secrets in violation of O.C.G.A. §§ 10-1-761(2)(B)(ii)(II) & (III).[16]

---

[16] Defendants contend that Diamond Power has failed to bring forth sufficient evidence that their alleged use of Diamond Power's trade secrets caused injury to

**C.      Conclusion**

In sum, the Court concludes that Plaintiff may proceed on its claim that

Defendants misappropriated (1) Invoiced Order Summary Reports ("IOS

Reports"); (2) the Bill of Materials Report ("BOM Report"); (3) the Cost Data

Report; (4) the Cost Markup Multipliers ("CMMs"); and (5) information

concerning the design of the PowerTrain product.  Insofar as Defendants seek

summary judgment on those claims, their motions are **DENIED**.  Insofar as

Defendants seek summary judgment on the remainder of Plaintiff's trade secret

claims, their motions are **GRANTED**.

**III.   Computer Fraud and Abuse Act**

The Court turns next to examine whether Defendants are entitled to

judgment as a matter of law on Diamond Power's claims under the Computer

Fraud and Abuse Act.

The Computer Fraud and Abuse Act ("CFAA" or "the Act"), 18 U.S.C. §

_____

Diamond Power.  As Diamond Power correctly contends, however, the Georgia Trade
Secrets Act provides an alternative in the event that Diamond Power fails to prove actual
loss or unjust enrichment at trial: "the court may award damages caused by
misappropriation measured in terms of a reasonable royalty for a misappropriator's
unauthorized disclosure or use of a trade secret for no longer than the period of time for
which use could have been prohibited."  O.C.G.A. § 10-1-763(a); see also Camp Creek
Hosp., 139 F.3d at 1412 ("Camp Creek's generalized evidence on damages does not
isolate losses directly attributable to any particular misuse of confidential information.
. . . Nevertheless, the GTSA expressly provides for the award of a reasonable royalty in
the event that the plaintiff cannot prove damages or unjust enrichment by a
preponderance of the evidence.") (citing O.C.G.A. § 10-1-763(a)).

1030, prohibits accessing a computer and obtaining information without authorization or by exceeding authorized access.  Diamond Power asserts violations of Sections 1030(a)(2)(C) and 1030(a)(4) of the Act.

Section 1030(a)(2)(C) provides:

[Whoever] intentionally *accesses* a computer *without authorization* or *exceeds authorized access* and thereby obtains . . . information from any protected computer if the conduct involved an interstate or foreign communication . . . shall be punished.

18 U.S.C. § 1030(a)(2)(C) (emphasis added).

Section 1030(a)(4) provides:

[Whoever] knowingly and with intent to defraud, *accesses* a protected computer *without authorization*, or *exceeds authorized access*, and by means of such conduct furthers the intended fraud and obtains anything of value . . . shall be punished.

18 U.S.C. § 1030(a)(4) (emphasis added).

Although principally a criminal statute,[17] the CFAA provides that "any person who suffers damage or loss [as a result of a violation] . . . may maintain a civil action . . . for compensatory damages and injunctive relief or other equitable relief."  18 U.S.C. § 1030(g).

---

[17] The CFAA does not distinguish between the elements required to prove a civil claim versus a criminal violation.  Thus, it would appear that the plaintiff would have to prove, by a preponderance of the evidence, the same elements required to prove a criminal violation of the CFAA to recover in a civil action.

Defendants argue that they are entitled to summary judgment because Davidson, at the time he accessed the relevant information, was an employee of Diamond Power who was fully authorized to access the information allegedly obtained.  Diamond Power responds that Davidson was only authorized to use its computers "for purposes of conducting Diamond Power business," and thus "Davidson's access of Diamond Power's computer network for a competitor's benefit was unauthorized."  (Pl.'s Opp. at 49.)

The phrase "without authorization" is not defined by the CFAA.  In the wake of this silence, courts have split on the question of whether an employee with an improper purpose may be held civilly liable under the CFAA for acquiring computer information otherwise permitted to the employee in advance of his employment.  On the one hand, several courts, applying the principle that "[t]he authority of an agent terminates if, without knowledge of the principal, he acquires adverse interest or if he is otherwise guilty of a serious breach of loyalty to the principal," Restatement (Second) of Agency § 112 (1958), have found a CFAA violation in such a circumstance.  See Int'l Airport Centers, L.L.C. v. Citrin, 440 F.3d 418, 420-21 (7th Cir. 2006) (Posner, J.) ("Citrin violated [the CFAA because] his authorization to access the laptop terminated when, having already engaged in misconduct and decided to quit IAC in violation of his employment contract, he resolved to destroy files that

incriminated himself and other files that were also the property of his employer, in violation of the duty of loyalty that agency law imposes on an employee."); Shurgard Storage Centers, Inc. v. Safeguard Self Storage, Inc., 119 F. Supp. 2d 1121, 1123, 1125-28 (W.D. Wash. 2000) (concluding that employer stated claim under CFAA against employee who had "full access" to employer's computers but allegedly misappropriated trade secrets for benefit of competitor); see also EF Cultural Travel BV v. Explorica, Inc., 274 F.3d 577, 583-84 (1st Cir. 2001).  But others, including at least two district courts within this Circuit, have opted for a less expansive view, holding that the phrase "without authorization" generally only reaches conduct by outsiders who do not have permission to access the plaintiff's computer in the first place.  See, e.g., In re America Online, Inc., 168 F. Supp. 2d 1359, 1370 (S.D. Fla. 2001) (concluding that the phrase "without authorization" in the CFAA "contemplate[s] a situation where an outsider, or someone without authorization, accesses a computer"); Lockheed Martin Corp. v. Speed, No. 6:05-CV-1580-ORL-31, 2006 WL 2683058, at *5 (M.D. Fla. Aug. 1, 2006) (same); Int'l Ass'n of Machinists & Aero. Workers v. Werner-Matsuda, 390 F. Supp. 2d 479, 498 (D. Md. 2005) ("Thus, to the extent that Werner-Masuda may have breached the Registration Agreement by using the information obtained for purposes contrary to the policies established by the IAM

AO 72A
(Rev.8/82)

Constitution, it does not follow, as a matter of law, that she was not authorized to access the information, or that she did so in excess of her authorization in violation of the SECA or the CFAA").

In the Court's view, the latter line of cases provides the more correct interpretation of the phrase "without authorization" in the CFAA. Defining "authorization" based upon the use of computer information, rather than upon the presence or absence of initial permission to access the computer, is in tension with both a plain reading of the Act and the manner in which the term "authorization" is used in other parts of the Act. Most prominently, it is inconsistent with the Act's use of the term "authorization" in its definition of "exceeds authorized access." <u>See</u> 18 U.S.C. § 1030(e)(6).

Section 1030(e)(6) defines "exceeds authorized access" as "to access a computer *with authorization* and to *use such access* to obtain or alter information in the computer *that the accesser is not entitled so to obtain or alter*.") (emphasis added). Thus, Section 1030(e)(6) contemplates that an "exceeds authorized access" violation occurs where the defendant first has initial "authorization" to access the computer. But, once the computer is permissibly accessed, the use of that access is improper because the defendant accesses information to which he is not entitled. Under <u>Citrin</u> and <u>Shurgard</u>, however, that distinction is overlooked. Under their reasoning, an employee

who accesses a computer with initial authorization but later acquires (with an improper purpose) files to which he is not entitled—and in so doing, breaches his duty of loyalty—is "without authorization," despite the Act's contemplation that such a situation constitutes accessing "with authorization" but by "exceed[ing] authorized access."  18 U.S.C. § 1030(e)(6).  The construction of Citrin and Shurgan thus conflates the meaning of those two distinct phrases and overlooks their application in § 1030(e)(6).

Under the more reasoned view, a violation for accessing "without authorization" occurs only where initial access is not permitted.  And a violation for "exceeding authorized access" occurs where initial access is permitted but the access of certain information is not permitted.  See Speed, 2006 WL 2683058, at *5 (defining "without authorization" as "those below authorization, meaning those having no permission to access whatsoever" and defining "exceeds authorized access" as "those above authorization, meaning those that go beyond the permitted access granted to them—typically insiders exceeding whatever access is permitted to them.").  Stated differently, a violation does not depend upon the defendant's unauthorized use of *information*, but rather upon the defendant's unauthorized use of *access*.[18]  See

---

[18] The legislative history supports this construction.  In Werner-Matsuda, the court noted that the 1986 amendments to the CFAA support an interpretation of the CFAA that does not reach authorized access, but improper use, of information:

Speed, 2006 WL 2683058, at *5 (noting that the contrary interpretation "is aimed not so much at the [e]mployees' improper access of the [] information, but rather at the [e]mployees' actions subsequent to their accessing the information").

There is no dispute that Davidson was authorized to initially access the computers he used at Diamond Power.  There is also no dispute that his level of authorized access included express permission (and password access) to obtain the specific information he later disclosed to Bergemann.  Accordingly, Davidson did not access the information at issue "without authorization" or in a manner that "exceed[ed] authorized access," and there was no violation of the CFAA.

_____

Perhaps best illustrating this point is the fact that in 1986 Congress amended the CFAA to substitute the phrase "exceeds authorized access" for the phrase "or having accessed a computer with authorization, uses the opportunity such access provides for purposes to which such authorization does not extend."  S. Rep. No. 99-432, at 9, U.S. Code Cong. & Admin. News 1986, pp. 2479, 2486.  By enacting this amendment, and providing an express definition for "exceeds authorized access," the intent was to "eliminate coverage for authorized access that aims at 'purposes to which such authorization does not extend,'" *thereby "remov[ing] from the sweep of the statute one of the murkier grounds of liability, under which a [person's] access to computerized data might be legitimate in some circumstances, but criminal in other (not clearly distinguishable) circumstances that might be held to exceed his authorization*."  S. Rep. No. 99-432, at 21, U.S. Code Cong. & Admin. News 1986, pp. 2479, 2494-95.

390 F. Supp. 2d at 499 n.12 (emphasis added).

Insofar as both Defendants move for summary judgment on Plaintiff's claim under the CFAA, their Motions are **GRANTED.**

## IV.    Other Tort Claims

Diamond Power also brings claims against Bergemann alleging misappropriation and conversion of property, tortious interference with business relations, unjust enrichment, and tortious interference with contract, and against Davidson for breach of fiduciary duty/duty of loyalty and conversion.  Defendants move for summary judgment on Diamond Power's remaining tort claims, arguing that such claims are superseded by the GTSA, and in any event, fail as a matter of law.

The GTSA generally supersedes "conflicting" common-law theories of recovery predicated on misappropriation of trade secrets.  See O.C.G.A. § 10-1-767(a) (providing that the GTSA "shall supersede conflicting tort, restitutionary, and other laws of this state providing civil remedies for misappropriation of a trade secret.").  It does not, however, affect claims sounding in contract or "[o]ther civil remedies that are not based upon misappropriation of a trade secret."  O.C.G.A. § 10-1-767(b).  These provisions have engendered some uncertainty regarding the extent to which the GTSA supersedes other tort theories.  See Penalty Kick, 318 F.3d at 1297 n.11 (noting

that "Georgia courts have not specifically defined what constitutes a conflict between the GTSA and the common law").

Relying on several cases outside of the Eleventh Circuit, Diamond Power argues that the GTSA only supersedes "law dealing exclusively with trade secrets."  See, e.g., Stone Castle Fin., Inc. v. Friedman, Billings, Ramsey & Co., 191 F. Supp. 2d 652, 659 (E.D. Va. 2002).  Alternatively, Diamond Power suggests that the GTSA only supersedes tort claims involving information which the factfinder eventually determines constitutes a trade secret, thus allowing a plaintiff to plead in the alternative and pursue its tort claims based on proprietary information until a jury finding has been made that the information constitutes a trade secret.  Cf. Penalty Kick, 318 F.3d at 1297.  Taking a much broader view of the GTSA's supersession provision, Defendants respond that the mere allegation of a trade secret precludes a plaintiff from bringing alternative theories of relief premised on allegations involving the information claimed to constitute a trade secret.  See Opteum Fin. Servs., LLC v. Spain, 406 F. Supp.2d 1378, 1380 (N.D. Ga. 2005) (holding that plaintiff was not entitled to pursue other common law theories of recovery respecting information it alleged was a trade secret).

The Eleventh Circuit, construing Georgia law, has appeared to track a middle course.  In Penalty Kick, the Eleventh Circuit held that the plaintiff's

claims for conversion, breach of a confidential relationship and duty of good faith, unjust enrichment, and quantum meruit were superseded by the GTSA, but only after determining that the information at issue rose to the level of a trade secret.  948 F.3d at 1297-98.  This case presents a somewhat different situation than Penalty Kick, however, because here, the Court has determined that a fact question exists concerning whether certain information rises to the level of a trade secret, but also has determined that certain other information relied upon in support of Diamond Power's claims does not constitute a trade secret as a matter of law.   Nevertheless, the court's discussion in Penalty Kick guides the Court's resolution.

Noting the split of authority on this issue, the court in Penalty Kick observed that the only pertinent Georgia case, Tronitec, Inc. v. Shealy, 547 S.E.2d 749, 755 (Ga. Ct. App. 2001), appeared to have adopted the rule that tort claims are superseded "to the extent that they contain the same factual allegations as the claim for use or misappropriation of trade secrets." Penalty Kick, 318 F.3d at 1297 n.11. Thus, where the "full extent" of the plaintiff's tort claims rely on the same allegations as those underlying the plaintiff's claim for misappropriation of a trade secret, the court reasoned, the claims are "conflicting" and thus precluded.  Although the court explicitly declined to address the situation presented here—where certain information does *not* rise to

the level of a trade secret—the court notably cited with favor the district court's

decision in <u>Powell Products, Inc. v. Marks</u>, 948 F. Supp. 1469, 1474-75 (D.

Colo. 1996) (interpreting Colorado's version of the Uniform Trade Secrets Act

("UTSA")), which reasoned that such claims may still be superseded if based

upon misappropriation of proprietary information:

> Preemption is only appropriate where "other claims are no more
> than a restatement of the same operative facts which would plainly
> and exclusively spell out only trade secret misappropriation."
> Plaintiff's conversion claim is a good example of a claim that is, at
> least in part, preempted by the UTSA.  In its conversion claim,
> plaintiffs allege that all defendants except Trey Marks stole trade
> secrets, mechanical drawings, blueprints, and specifications of the
> plaintiff's machine. *To the extent that plaintiff's claim seeks*
> *recovery for defendants' misappropriation of plaintiff's intellectual*
> *property, it is seeking to recover for misappropriation of trade*
> *secrets.*  If the design of the plaintiff's machine is not a trade
> secret, plaintiff has no property right in its design, and it therefore
> would have no claim.  Alternatively, if the design is a trade secret,
> plaintiff's claim is preempted by the UTSA.  Because plaintiff's
> claim also seeks recovery of the physical items stolen, including
> blueprints and drawings, which would not be the subject of a
> misappropriation claim under the UTSA, plaintiff's conversion
> claim is not entirely preempted.

<u>Id.</u> (quoting Roger M. Milgrim, Milgrim on Trade Secrets, § 1.01[4], at 1-68.14

(1996)) (emphasis added).

All this is to say that the rule of supersession is guided by the purpose of

the constraints imposed by the GTSA—constraints which require the plaintiff to

demonstrate economic value in claimed proprietary information and reasonable

efforts to preserve its secrecy in order to recover for an asserted

misappropriation of that information.  If a plaintiff could alternatively recover for misappropriation of non-proprietary information or misappropriation of unguarded proprietary information, the legislative judgment contained in the GTSA—that such information should otherwise flow freely in the public domain—would be subverted.  And it would make little sense to go through the rigamarole of proving information was truly a trade secret if a plaintiff could alternatively plead claims with less burdensome requirements of proof.  Since such an attempt to circumvent those requirements would be "in conflict" with the mandates of the GTSA, the GTSA renders such claims superseded.  See Tronitec, Inc., 547 S.E.2d at 755.  But if a claim seeks to remedy an injury caused not by the misappropriation of proprietary information, but by separate conduct—such as the misappropriation of *physical* property or the improper interference with contractual relationships respecting something other than proprietary information—such a claim cannot be said to be "in conflict" with the GTSA.

Applying this analysis, it is clear that Diamond Power's common law conversion claims are superseded by the GTSA.  They seek recovery for precisely the same conduct and resulting injury as Diamond Power alleged was caused by the misappropriation of its trade secrets: the taking of supposedly proprietary information.

Diamond Power's unjust enrichment claim against Bergemann suffers from the same defect. The allegations in its Complaint supporting this claim assert no independent conduct or injury besides that Bergemann was enriched by the value of Diamond Power's proprietary information. Moreover, Diamond Power's arguments on summary judgment make no attempt to distinguish the factual basis for its unjust enrichment claim from the factual basis for its trade secrets claims. (<u>See</u> Opp. at 57 ( "Bergemann, through its agent Mr. Davidson, was unjustly enriched by Mr. Davidson's access to, and theft of, Diamond's information.").)

A more difficult question arises regarding Diamond Power's breach-of-fiduciary-duty claim against Davidson, since it is conceivable that a breach-of-fiduciary-duty claim may involve separate conduct and injury from that remedied by a trade secrets claim. Nevertheless, a close examination of that claim reveals that it is wholly based on the same allegations upon which Diamond Power's misappropriation-of-trade-secrets claims are based. Diamond Power's only substantive factual allegation in its Complaint in support of its breach-of-fiduciary-duty claim is the following: "Davidson's conduct prior to his separation from employment with Diamond Power, including but not limited to the appropriation and misappropriation of proprietary information owned by Diamond Power, constitutes a breach of his

fiduciary duties . . . .”  (Compl. [1] ¶ 36, in <u>Diamond Power v. Davidson</u>, No. 1:04-CV-0091-RWS.)  Moreover, Diamond Power's briefs candidly acknowledge that its breach-of-loyalty/fiduciary-duty claim is “premised on the same core facts as are the claims common to both cases; the claims are unique only in that they depend on distinct sources of legal duty . . . .”  (Pl.'s Opp. at 2, in <u>Diamond Power v. Davidson</u>, No. 1:04-CV-0091-RWS.)  Diamond Power simply does not make any effort to distinguish the conduct or resulting injury on which it bases its trade secrets claim from the conduct or resulting injury on which it bases its fiduciary-duty claim.  As such, it is superseded by the GTSA. <u>See</u> <u>Penalty Kick</u>, 318 F.3d at 1297 & n.13 (holding that breach-of-confidential-relationship and duty-of-good-faith claim superseded by GTSA because it “asserts the same exact basis for relief” and plaintiff “does not at any point in this case distinguish confidential information from trade secret information, [and thus] the only inference is that [the plaintiff] was referring to the same confidential information in each of its claims”).

Finally, while claims alleging tortious interference with contract and tortious interference with business relations may also conceivably be distinct from a misappropriation-of-trade-secrets claim, a close examination of the facts relied upon by Diamond Power in support of those claims reveals that they are

nothing more than dress-up efforts to recover for misappropriation of trade secrets, and as such, are superseded by the GTSA.

In support of its tortious-interference-with-business-relations claim, Diamond Power alleges that Bergemann used confidential information to improperly induce customers and revenues away from Diamond Power. (See PSMF ¶ cliv.)  In support of its tortious-interference-with-contractual-relations claim, Diamond Power similarly states that Bergemann "facilitated and caused Davidson to breach his contractual obligations to return all proprietary information to the company."  (See Pl.'s Opp. at 58.)

To prove tortious interference with contractual or business relations, "a plaintiff must show defendant: (1) acted improperly and without privilege, (2) acted purposely and with malice with the intent to injure, (3) induced a third party or parties not to enter into or continue a business relationship with the plaintiff, and (4) caused plaintiff financial injury."  Bacon v. Volvo Service Center, Inc., 597 S.E.2d 440, 444 (Ga. Ct. App. 2004) (quoting Wilson v. City of Sardis, 590 S.E.2d 383, 385 (Ga. Ct. App. 2003)).  Improper inducement may thus involve separate proof of conduct and injury from the conduct and injury required to prove misappropriation of a trade secret.  See, e.g., Bacon, 597 S.E.2d at 444 (considering merits of tortious-interference claims after rejecting trade secrets claim premised on somewhat different facts, but not

considering whether such claims were superseded based upon similar allegations). Under certain circumstances, therefore, such claims may be distinct from, and not in conflict with, a misappropriation-of-trade-secrets claim.

But an examination of the evidence in this case shows that Diamond Power relies on precisely the same conduct and injury in support of its interference claims as the conduct necessary to prove its trade-secrets claims. The only facts Diamond Power cites in support of its tortious-interference claims are the following: (1) "Bergemann has stolen and used Diamond Power's confidential information to steal customers, and revenue from customers, away from Diamond," and (2) "[b]y permitting and maintaining Diamond Power proprietary information on its computer system and in the possession of its employees . . . Bergemann aided and abetted Davidson in his breach of his contractual obligation to return to Diamond Power its property and proprietary information upon his separation from employment."  (PSMF ¶¶ clii-cliv.)  In essence, Diamond Power claims that, by acquiring Diamond's proprietary information, Bergemann was more competitive in the market, derived additional revenues from its customers, and assisted Davidson in the breach of his contractual confidentiality obligations.

But significantly, Diamond Power does not point to a single individual that was induced not to enter into or continue a business relationship.[19]  Nor does Diamond Power make any attempt to distinguish the proof of conduct or injury it relies upon for its misappropriation claim from that required for either its interference-with-business-relations or interference-with-contractual-relations claims.  Contra Bacon, 597 S.E.2d at 444.  As such, both claims are superseded by the GTSA.

In sum, the Court concludes that the "full extent" of Diamond Power's conversion, unjust enrichment, breach of fiduciary duty, and tortious interference claims are clearly "based" upon a trade secret.  They are thus superseded by the GTSA.  Penalty Kick, 318 F.3d at 1298.  Accordingly, insofar as Defendants move for summary judgment on these claims, their Motions are **GRANTED**.

## V.    Breach of Contract

In its final contention, Diamond Power alleges that Davidson breached his contract with Diamond Power by failing to return proprietary information upon the termination of his employment and by failing to disclose the conflict

---

[19] For this reason, even assuming Diamond Power's interference-with-business-relations claim were not superseded by the GTSA, the Court would be inclined to find it insufficient as a matter of law.

of interest that arose when he accepted employment with Bergemann but continued working for Diamond Power.  (See Pl.'s Opp. at 6-7.)

In 1985, upon commencing employment with Diamond Power, Davidson executed an agreement titled "Proprietary Information and Conflict of Interest Agreement," which provided as follows:

> In consideration of my employment . . .
>
> 1.    I will not disclose to anyone outside of [Diamond Power] . . . any technical or non-technical information . . . relating to [Diamond Power] . . . . I further agree that upon termination of my employment . . . all records of proprietary information of [Diamond Power] including copies thereof in my possession, whether prepared by me or others will be left with [Diamond Power].
>
> . . . .
>
> 4.    During the period of my employment, I will not independently engage in the same or similar line of business or research as that carried on by [Diamond Power], or directly or indirectly service, advise or be employed by any individual, firm or company engaged in the same or similar line of business . . . . I will not engage in any activity whatsoever which will involve a conflict in use of my time as an employee of [Diamond Power] . . . .
>
> . . . .
>
> 6.    . . . . b.  Should any matter or dealings in which I am now involved or hereafter become involved, on my own behalf or as an employee of [Diamond Power], appear to present a possible conflict of interest under the Company policy then in effect, I will promptly disclose the facts to my supervisor so that a determination can be made as to whether a conflict does exist.

(Ex. 1 to Davidson Dep. I.)

Davidson first contends that Diamond Power's breach-of-contract claim is superseded by the GTSA because it is based upon a misappropriation of trade secrets. This argument is clearly foreclosed by the language of the GTSA. O.C.G.A. § 10-1-767(b)(1) ("This article shall not affect . . . [c]ontractual duties or remedies, *whether or not based upon misappropriation of a trade secret . . . .*") (emphasis added).

Davidson's second contention in support of summary judgment is that the plain language of the contract relates only to conflicts that occur during Davidson's "time as an employee." Although Davidson's argument is far from clear, it appears that Davidson argues that the agreement only prevents him from engaging in conflicted activities during work hours, and that the facts support only a finding that he engaged in conflicted activities outside of work. The Court disagrees on both counts. The Agreement plainly restricted Davidson from directly "servic[ing], advis[ing] or be[ing] employed by any individual, firm or company engaged in the same or similar line of business" during his employment with Diamond Power. Moreover, Davidson does not contend that a factual dispute does not exist concerning his breach of Paragraphs 1 and 6, which required him to report conflicts of interest and return all technical or non-technical information upon his departure from Diamond Power. Having reviewed the evidence, the Court concludes that a fact dispute

exists concerning whether Davidson breached the Proprietary Information and Conflict of Interest Agreement.[20]

Accordingly, Davidson's Motion for Summary Judgment on this claim is **DENIED**.

### Conclusion

For the foregoing reasons, Defendant Wayne Davidson's Motion for Summary Judgment [68] filed in Case No. 1:04-CV-0091-RWS-CCH is **GRANTED in part and DENIED in part.** It is granted insofar as it seeks judgment as a matter of law on Plaintiff's claims alleging misappropriation of the following trade secrets: (1) Hardware Book file, (2) PI Forms Library, (3) FWI Library, and (4) PI Configurator. It is also granted insofar as it seeks judgment as a matter of law on Plaintiff's claims alleging breach of fiduciary duty/duty of loyalty, violations of the Computer Fraud and Abuse Act, and misappropriation/conversion of property. It is denied insofar as it seeks judgment as a matter of law on Plaintiff's claims alleging misappropriation of the following trade secrets: (1) IOS Reports, (2) BOM Report, (3) Cost Data Report, (4) Cost Markup Multipliers ("CMMs"), and certain information

---

[20] Davidson also argues that Diamond Power's breach-of-contract claim fails because it has suffered no damages. Diamond Power continued to pay Davidson salary at a time during which he allegedly was in breach of his confidentiality and conflict obligations. If proven, a breach of Diamond Power's agreement with Davidson may entitle Diamond Power to a partial recoupment of Davidson's salary or other damages.

concerning the PowerTrain system.  It is also denied insofar as it seeks

judgment as a matter of law on Plaintiff's claim alleging breach of contract.

Defendant Clyde Bergemann's Motion for Summary Judgment [210]

filed in Case No. 1:04-CV-1708-RWS-CCH is **GRANTED in part and**

**DENIED in part**.  It is granted insofar as it seeks judgment as a matter of law

on Plaintiff's claims alleging misappropriation of the following trade secrets:

(1) Hardware Book file, (2) PI Forms Library, (3) FWI Library, and (4) PI

Configurator.  It is also granted insofar as it seeks judgment as a matter of law

on Plaintiff's claims alleging violations of the Computer Fraud and Abuse Act,

tortious interference with business relations, tortious interference with

contractual relations, unjust enrichment, and misappropriation/conversion of

property.  It is denied insofar as it seeks judgment as a matter of law on

Plaintiff's claims alleging misappropriation of the following trade secrets: (1)

IOS Reports, (2) BOM Report, (3) Cost Data Report, (4) Cost Markup

Multipliers ("CMMs"), and certain information concerning the PowerTrain

system.

The parties are **DIRECTED** to file their proposed pretrial orders within

twenty (20) days of the entry of this Order.

**SO ORDERED** this   28th   day of September, 2007.


RICHARD W. STORY
UNITED STATES DISTRICT JUDGE